EXXON CORPORATION, Appellant,

v.

STATE of Alaska, Appellee.

No. S–9164.

Supreme Court of Alaska.

Oct. 12, 2001.

Rehearing Denied Feb. 21, 2002.

William F. Cronin and Johnathan E. Mansfield, Corr Cronin LLP, Seattle, and Douglas J. Serdahely and Kevin Callahan, Patton Boggs LLP, Anchorage, for Appellant.

Virginia B. Ragle, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. *INTRODUCTION*

In 1988 Exxon discovered the Point McIntyre oil reservoir, a bonanza with an estimated value of $4,783,800,000. Now, Exxon and the State of Alaska dispute who will absorb $24 million in field costs associated with the reservoir based on their opposing interpretations of a contract, the Prudhoe Bay Unit Agreement. We conclude that the state has the discretion under the terms of the agreement to consider the public interest according to state law and to deny the expansion of the Prudhoe Bay Unit to include the Pt. McIntyre reservoir. This conclusion is dispositive of the numerous arguments raised on appeal. We therefore affirm the commissioner's decision.

## II. *FACTS AND PROCEEDINGS*

In the late 1960's the predecessors of Exxon and Arco acquired several oil and gas leases on the Alaska North Slope.[1] Each lease had a ten-year term and provided a royalty to the state—twelve and one-half percent of all oil and gas production. These leases provided that the state could take its royalty in oil or gas products (in kind) or in equivalent dollar value (in value). If the state took its royalty in kind, the lease provided that the lessees could deduct only their cleaning and dehydration field costs.[2] The leases did not mention field cost deductions when the state took its royalty in value.

In 1977 Exxon, Arco, and the state, through the Department of Natural Resources, entered into the Prudhoe Bay Unit Agreement (PBUA). A unit agreement is a contract between the department and lessees that allows for the efficient development of a reservoir that underlies multiple leases owned by different lessees. The various lessees join together in exploration and drilling, and allocate costs and production. The PBUA was not based on the state's model unit agreement; the lessees drafted the PBUA. The state approved the PBUA effective April 1, 1977.

The PBUA unitized 111 leases, including portions of the five previously mentioned[3] Exxon and Arco leases. The Prudhoe Bay Unit (PBU) includes most of the land described by these leases. The PBUA also had expansion and contraction provisions; these provisions allowed the selective increase and decrease of the lands and natural resources controlled by the agreement.

Expansion of the unit would extend the terms of the PBUA to additional lands. Expansion was generally thought to be desirable by both the state and the lessees because it allowed efficient administration under the existing agreement and efficient shared production with existing facilities. Expansion under the PBUA required that the "geologic condition" was met—that the additional lands contained a reservoir any portion of which was within the PBU.

Contraction excluded nonproductive lands from the unit agreement. The threat of contraction was a stimulus for the lessee to discover oil and develop production into paying quantities or to lose the lease and the opportunity to discover and produce oil. The PBUA required that all lands not included in a participating area,[4] or entitled to be included in a participating area, would be contracted out of the PBUA after ten years.

The PBUA extended the original leases until April 1, 1987. Once production began, the terms of the PBUA would continue in force for so long as oil or gas was being produced in paying quantities.

Shortly after the PBU lessees began paying royalties based on their interpretation of the lease terms, the state sued the lessees. In *State v. Amerada Hess*,[5] one issue was whether the lessees could deduct field costs when the state took its royalty in value. On motions for partial summary judgment, the superior court ruled that the lessees could not.[6] It held further that the state could

---

1. Appendix A contains a map that marks the various lease parcels, the Pt. McIntyre reservoir, and the Prudhoe Bay Unit. Exxon and Arco obtained the rights to Alaska Division of Lands leases 34626, 34627, 34624, 28297, 28298, and 34622. We adopt the parties' shorthand reference of "ADL" followed by the lease number. Tracts 5, 6, 7, and 8 correspond to those portions of ADLs 34626, 34627, 34624, and 28297, respectively, that were within the original PBU boundary. Tracts 115 and 116 correspond to ADLs 28298 and 34622. BP later acquired ADL 365548 (tract 117).

2. Field costs are all of the costs of production incurred from the wellhead to the custody transfer meters into the Trans Alaska Pipeline. Field costs generally include gathering, separation, cleaning, dehydration, compression, and other handling costs.

3. *See supra* n. 1.

4. "Participating areas" are portions of the unit "reasonably known to be underlain by hydrocarbons and known or reasonably estimated ... to be capable of producing or contributing to production of hydrocarbons in paying quantities." 11 Alaska Administrative Code (AAC) 83.351(a) (1996).

5. No. 77–847 Ci. (Alaska Super., 1st Dist., Juneau, complaint filed September 2, 1977).

6. No. 77–847 Ci. (Alaska Super., 1st Dist., Juneau, April 6, 1979).

take its royalty in kind only if the market value of the oil or gas exceeded the royalty in value because only then would taking the royalty in kind be "in the best interests of the state and for the maximum benefit of its people."

This ruling apparently pleased neither the lessees nor the state, because soon after the ruling, the parties settled the dispute on terms that differed significantly from the court's partial summary judgment ruling. Under the 1980 Royalty Settlement Agreement, the state agreed to pay a field cost allowance for its PBU royalty whether in value or in kind. The field cost allowance was initially set at forty-two cents per barrel but was to be adjusted annually based on the Producer Price Index. (By 1993 the cost had increased to seventy-nine cents per barrel.) The superior court approved the settlement and allowed it to supersede the court's previous ruling on the merits.

During the *Amerada Hess* litigation, the legislature amended AS 38.05.180(f) to make it clear that the lessees could not deduct field costs from the state's royalty share under the existing, standard-form state oil and gas leases.[7] Subsequent leases expressly disallowed all field costs deductions. In addition, all but one of all unit agreements approved after 1978 disallowed field cost deductions.

In early 1984 the director of the Division of Oil and Gas, acting for the commissioner of the Department of Natural Resources, allowed an expansion of the PBU. The director's decision was based on geological, royalty and rental, and public interest considerations. The director also conditioned the expansion on two changes to one of the affected leases.

In early 1985 the director approved an expansion of the Duck Island Unit and a corresponding contraction of the PBU. The director's decision again noted several factors: environmental costs and benefits of unitized development; geological characteristics of the reservoir; prior exploration activities; applicant's development plans; and the economic costs and benefits to the state.

In late 1985 BP acquired the oil and gas lease to the remaining portion of the yet-to-be-discovered Pt. McIntyre reservoir. Following the amended AS 38.05.180(f), the BP lease expressly disallowed all field costs deductions.

In late 1986 Exxon and Arco applied to defer contraction of the PBU for five years. They invoked a department regulation, 11 AAC 83.356(b),[8] as authority to defer contraction, because the PBUA had no provisions for deferral of contraction. The lessees argued that a delay was justified by both the public interest criteria of 11 AAC 83.303[9]

---

**7.** *See* ch. 155, § 1, SLA 1978 (currently codified at AS 38.05.180(f)(2)); ch. 160, § 16, SLA 1978 (currently codified at AS 38.05.180(z)).

**8.** 11 AAC 83.356(b) (1996) gives the department authority to delay contraction of unit under certain circumstances:

(b) 10 years after sustained unit production begins, the unit area must be contracted to include only those lands then included in an approved participating area and lands that facilitate production including the immediately adjacent lands necessary for secondary or tertiary recovery, pressure maintenance, reinjection, or cycling operations. The commissioner will, in the commissioner's discretion, after considering the provisions of 11 AAC 83.303, delay contraction of the unit area if the circumstances of a particular unit warrant. If any portion of a lease is included in the participating area, the portion of the lease outside the participating area will neither be severed nor will it continue to be subject to the terms and conditions of the unit. The portion of the lease outside the participating area will continue in

full force and effect so long as production is allocated to the unitized portion of the lease and the lessee satisfies the remaining terms and conditions of the lease.

**9.** 11 AAC 83.303 (1996) states the criteria to consider in determining the public interest:

(a) The commissioner will approve a proposed unit agreement for state oil and gas leases if he makes a written finding that the agreement is necessary or advisable to protect the public interest considering the provisions of AS 38.05.180(p) and this section. The commissioner will approve a proposed unit agreement upon a written finding that it will

(1) promote conservation of all natural resources, including all or part of an oil or gas pool, field, or like area;

(2) promote the prevention of economic and physical waste; and

(3) provide for the protection of all parties of interest, including the state.

(b) In evaluating the above criteria, the commissioner will consider

(1) the environmental costs and benefits of unitized exploration or development;

and geological considerations. In early 1987 the director granted a conditional deferral [10] of the PBU contraction. The parties now dispute the terms of this deferral and whether the lessees met the conditions.

In January 1992 the lessees presented the department with their plans to seek deferral of contraction until September 1, 1993; they also sought expansion of the PBU to include the Pt. McIntyre reservoir. On February 28, 1992, the lessees asked the department for a second deferral pursuant to 11 AAC 83.356(b).

On March 25, 1992, the director stated that the department would "delay a decision on the contraction request" until it had the opportunity to review the additional well data. The lessees informed the department that, due to technical problems, they were unable to provide the department with the requested well data until September 1992. The department indicated that it would "further delay a decision to defer contraction of the Prudhoe Bay Unit ... until September 30, 1992." Continuing technical problems caused Arco to ask for a further postponement of its deadline to provide the well data. The department responded that it was "unwilling to delay a decision regarding the orig-inal deferral of contraction request beyond the first quarter of 1993."

On March 1, 1993, the lessees requested that the department establish the Pt. McIntyre participating area. On March 18, 1993, the lessees petitioned the department to expand the PBU to include the Pt. McIntyre reservoir. The first sentence of that letter suggested that the authority to expand the PBU was based on the PBUA and the department's regulations: "Pursuant to the provisions of Section 5.3 and Section 9.1 of the Prudhoe Bay Unit Agreement and 11 AAC 83.351 and 11 AAC 83.356, ARCO Alaska, Inc., for itself and on behalf of Exxon Corporation and BP Exploration, Inc., hereby petitions the Department of Natural Resources to expand the boundaries of the Prudhoe Bay Unit ...." (Parentheticals omitted.)

On March 31, 1993, the lessees petitioned for further deferral of contraction of the PBU. By 1993, the lessees claimed to have spent more than $287 million to develop the Pt. McIntyre and West Beach reservoirs for production.

In two separate decisions the director denied the lessees' requests to defer contraction and to expand the PBU.[11] On April 14, 1993, the director denied the lessees' request

---

(2) the geological and engineering characteristics of the potential hydrocarbon accumulation or reservoir proposed for unitization;
(3) prior exploration activities in the proposed unit area;
(4) the applicant's plans for exploration or development of the unit area;
(5) the economic costs and benefits to the state; and
(6) any other relevant factors, including measures to mitigate impacts identified above, the commissioner determines necessary or advisable to protect the public interest.
(c) The commissioner will consider the criteria in (a) and (b) of this section when evaluating each requested authorization or approval under 11 AAC 83.301—11 AAC 83.395, including
(1) an approval of a unit agreement;
(2) an extension or amendment of a unit agreement;
(3) a plan or amendment of a plan of exploration, development or operations;
(4) a participating area; or
(5) a proposed or revised production or cost allocation formula.

10. The director's decision stated in relevant part:

This approval is conditioned on the following terms:
(A) A well to delineate the hydrocarbon reserves underlying [ADL] 34626 and ADL 34627 must be drilled and completed prior to April 1, 1992; and
(B) A commitment by the lessees to drill a second well to delineate the hydrocarbon reserves underlying ADL ... 28297 and ADL 34624 must be made by April 1, 1992.
Should these leases not be included within an approved participating area on April 1, 1992, or should the required well not be completed or the commitment for the second well not secured by that date, ADLs 28297, 34624, 34626, and 34627 will be contracted out of the Prudhoe Bay Unit as of that date.

11. Exxon had asked that the department consider the expansion and contraction issues together. At one point, Exxon raised the issue of whether the director's refusal to consider the issues together was arbitrary and capricious. Because no further argument of this issue appears in Exxon's brief, we conclude that Exxon has waived the issue. See Martinson v. Arco Alaska, Inc., 989 P.2d 733, 737 (Alaska 1999).

to defer contraction of the PBU. Because of the delays and based on the criteria of 11 AAC 83.303, the director contracted tracts 5, 6, 7, and 8 from the PBU effective April 1, 1993.

On August 18, 1993, the director denied the expansion of the PBU. He applied 11 AAC 83.303 and considered factors including the environmental costs and benefits, the geological characteristics and previous exploration, the lessees' plans for development, and the economic costs and benefits to the state. A large portion of the decision focused on field costs.

The lessees appealed both decisions to the commissioner.

The lessees negotiated with the director and developed an amended application to expand the PBU to include the Pt. McIntyre reservoir, which the director granted. In the amended application, BP and Arco withdrew their appeals of the director's contraction and expansion decisions and waived any right to a field cost deduction except for production attributable to the small portion of the Pt. McIntyre reservoir that underlay the original boundary of the PBU. Exxon did not agree to waive its rights to a field cost deduction on Pt. McIntyre production. However, Exxon did agree to forego the deduction pending the final resolution of the issue, subject to later recoupment from the department. The amended application expressly noted Exxon's right to appeal or commence litigation in the superior court and specifically limited Exxon's arguments on appeal. The parties dispute exactly what arguments Exxon waived by this agreement.

On November 12, 1993, the commissioner upheld the director's decision to contract the PBU. He initially focused on the lessees' substantial delays in developing tracts 5, 6, 7, and 8. The commissioner interpreted the director's actions prior to the director's decision to contract the PBU as delaying the decision to contract rather than granting a deferral of contraction. He found the authority to delay contraction under 11 AAC 83.356(b), which, he concluded, required him to consider the criteria specified in 11 AAC 83.303. The commissioner noted that unitization of the Pt. McIntyre leases was gener-

ally in the public interest, but the public interest in conservation of natural resources could be equally served by deferring contraction of the PBU or by contracting the PBU and forming a new unit that used the PBU's excess processing capacity. The commissioner then concluded that deferring contraction of the PBU was not in the public interest based on environmental costs and benefits, geological and engineering considerations, prior exploration activities, and economic costs and benefits to the state. Because the commissioner found that any deferral of the contraction was not in the public interest, he decided that the original request for deferral should have been denied and denied the deferral retroactive to April 2, 1992.

On December 2, 1994, the commissioner affirmed the director's denial of PBU expansion. He expressly did not adopt two points: that the state would never allow a field cost deduction, and that PBU expansion should be denied in part because the state has paid more under the 1980 settlement than it ever intended to pay. He noted that, while under some circumstances a field cost deduction might be allowed, it depended on the public interest analysis. The commissioner also stated that using the state's discretionary powers to recoup perceived losses under prior agreements was not good public policy and expressly disclaimed reliance on this rationale for denying expansion of the PBU.

The commissioner specifically concluded that Exxon did not have an absolute right to expansion for two reasons. First, the geologic requirements of the PBUA were not met. The PBUA requires that any additional lands to be incorporated into the PBU contain a reservoir, any portion of which is within the PBU. No part of the Pt. McIntyre reservoir was within the PBU on March 18, 1993, because the contraction decision previously removed tracts 6, 7, and 8 from the PBU effective April 1, 1992. Second, the department had discretion to deny expansion of the PBU in the public interest according to state statute and the PBUA. In considering the public interest, the commissioner first generally stated "that the public interest with respect to non-economic and even some economic matters would be served at least as

well if not better by the creation of a new unit as it would by expansion of the PBU to include the [Pt. McIntyre reservoir]." He then specifically noted that the field cost allowance under the 1980 settlement exceeded Exxon's likely actual field costs and concluded that allowing Exxon to make a profit at the state's expense was not in the public interest. The commissioner also noted that the public interest favored treating Exxon like the other lessees of the Pt. McIntyre area, who were not permitted a field costs deduction.

Exxon appealed both of the commissioner's decisions. The appeals were consolidated before Superior Court Judge John E. Reese. On May 19, 1999, Judge Reese affirmed the commissioner's decision. Exxon appeals the following issues: (1) whether the department retained discretion under the PBUA to deny expansion of the PBU; (2) whether the department breached the PBUA by contracting the PBU; (3) whether the decision to deny expansion violated the 1980 settlement; (4) whether the department violated Exxon's constitutional rights; and (5) whether the department was equitably estopped from denying expansion or ordering contraction of the PBU.

## III. STANDARD OF REVIEW

■■■ When the superior court acts as an intermediate court, we directly review the administrative agency decision under consideration.[12]

■■■ We apply a substitution of judgment standard of review for agency decisions on questions of law where no expertise is involved.[13] Interpretation of a contract is a question of law that is not within the department's special expertise or skill. "Where ... there is no conflict in extrinsic evidence, the interpretation of contract is a question of law." [14]

■■■ But when the finder of fact must determine the meaning of a contract based on extrinsic evidence that raises conflicting inferences, "our inquiry is limited to determining whether the trier of fact's choice of inferences is supported by substantial evidence." [15] In this case, almost all of the extrinsic evidence raises conflicting inferences. Thus, we review the commissioner's choice of inferences for substantial evidentiary support.

## IV. DISCUSSION

Exxon's arguments on appeal are based on one critical contention: that the PBUA abrogated the department's discretion to deny expansion and to order contraction of the PBU. Exxon's additional claims that the department breached the 1980 settlement, unconstitutionally impaired the PBUA contract, unconstitutionally worked a taking, and should be equitably estopped all derive from the department's exercise of discretion in making the contraction and expansion decisions. The state disputes Exxon's view that the PBUA destroyed its power over expansion and contraction. As discussed in greater detail below, our conclusion that the department had the discretion to deny expansion of the PBU in the public interest and in accord with state law is dispositive of this matter.

A. Exxon Did Not Waive the Argument that the Pt. McIntyre Reservoir Was Partially within the Boundaries of the PBU.

As a preliminary matter, we address the state's contention that Exxon waived its right to make certain arguments on appeal. The state argues that in the amended application for PBU expansion Exxon agreed to present its position as if the geologic condition—that the Pt. McIntyre reservoir was at least partially within the boundaries of the PBU—was not met. Exxon argues that the state's in-

---

12. See Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992).

13. See id.

14. Leisnoi, Inc. v. Stratman, 956 P.2d 452, 454 (Alaska 1998).

15. Zito v. Zito, 969 P.2d 1144, 1147 n. 4 (Alaska 1998) (quoting Wahl v. Wahl, 945 P.2d 1229, 1232 n. 3 (Alaska 1997)).

terpretation of the amended application is incorrect because it would render Exxon's express right to appeal meaningless, because Exxon can prevail on appeal only if it can prove that the geologic condition was met. Neither side disputes that a small portion of the Pt. McIntyre reservoir actually underlies the original PBU and thus meets the geologic condition.

The amended application for PBU expansion summarizes the parties' positions and agreement as follows:

> Exxon disagrees with the State regarding their respective rights. To allow production of the Pt. McIntyre Participating Area to begin while preserving Exxon's rights and the State's rights, the Applicants propose the following procedure:
>
> . . . .
>
> iii. Exxon may appeal to or commence litigation in (or both) the Alaska Superior Court, and/or may appeal to the Commissioner, to contend among other things that the Commissioner's Contraction Decision (assuming he affirms the Contraction Decision) and other DNR decisions concerning the Pt. McIntyre Participating Area and the Contracted Acreage [16] were incorrect. Any such appeal or litigation is collectively referred to as the "Contest."
>
> In the Contest, . . . Exxon shall not challenge the legality of DNR's established procedures or DNR's power and authority to act and make decisions concerning the contraction or expansion of the PBU, the Pt. McIntyre Participating Area, or the Contracted Acreage, but may claim, for example, that the established procedures were not followed or that the DNR decisions or actions are not consistent with applicable law. Also, Exxon shall not claim that the DNR is disqualified from acting because the State could realize a gain as a result of the DNR's actions.
>
> . . . .

> iv. Exxon must present its position in the Contest as if the Contracted Acreage were not in the PBU . . . until Exxon obtains a final, non-appealable ruling that the Contracted Acreage should not have been contracted out of the PBU. If Exxon obtains such a ruling, it may use the ruling in presenting its position in the Contest. Exxon, however, shall not at any time . . . argue or claim that it is entitled to field costs or any other costs or relief because . . . the Pt. McIntyre Participating Area [is] in the PBU as a result of granting this Amended Application or the Production Application. Exxon recognizes and agrees that such an argument would be "bootstrapping."
>
> . . . .
>
> vi. By filing this Amended Application and pursuing any relief permitted by it, Exxon does not waive any rights which it may have to field and other costs under the terms of the Pt. McIntyre Participating Area leases . . . .
>
> vii. All appellate rights of the State and Exxon, if any, are preserved.

The commissioner interpreted the "no bootstrapping" paragraph as a waiver of Exxon's argument that the geologic condition was met, because Exxon had to present its position as if tracts 5, 6, 7, and 8 were not in the PBU. If tracts 6, 7, and 8 are not in the PBU, the geologic condition cannot be met.

 We think the commissioner read the waiver too broadly for two reasons: first, the parties intended to preserve the status quo on the field costs issue while simultaneously allowing development of the Pt. McIntyre reservoir; second, the state's interpretation eviscerates Exxon's right to appeal the field costs issue. Our goal when interpreting contracts is to "give effect to the reasonable expectations of the parties." [17] The relevant section of the agreement begins with a statement of intent: "To allow production of the Pt. McIntyre Participating Area to begin while preserving Exxon's rights and

**16.** "Contracted Acreage" referred to tracts 5, 6, 7, and 8.

**17.** *Stepanov v. Homer Elec. Ass'n,* 814 P.2d 731, 734 (Alaska 1991) (quoting *Mitford v. de Lasala,* 666 P.2d 1000, 1005 (Alaska 1983)).

the State's rights." The express intent of the amended agreement was to avert an impasse by isolating the field costs issue for separate resolution on appeal.

Moreover, we have repeatedly noted that "[a] court should not interpret an agreement in a manner which would give meaning to one part of an agreement at the cost of annulling another part."[18] Exxon expressly retained a right to "appeal to or commence litigation in (or both) the Alaska Superior Court." Interpreting the "no bootstrapping" paragraph as a general waiver of an argument required for Exxon to prevail on appeal effectively eliminates Exxon's right to appeal. Instead, we read the agreement to give Exxon a meaningful right of appeal while preserving the "no bootstrapping" provision. Accordingly, Exxon may argue in this appeal that the geologic condition was met because the facts so indicate but not because the state approved the amended application for expansion.

**B.** *The Department of Natural Resources Has the Authority to Deny Expansion of the PBU Under the PBUA.*

While the parties dispute numerous aspects of the expansion and contraction decisions,[19] we find one issue dispositive—whether the department had the authority to consider the state's best interests in making a decision on expansion of the PBU.

Exxon argues that the department has no discretion to determine unit expansion; rather, Article 9 of the PBUA controls. Exxon interprets the PBUA to give itself a unilateral right to expand the PBU so long as the lands to be added contained a reservoir that was partially within the PBU. If this "geologic condition" was met, Exxon argues, the

department had no discretion to deny expansion.

The state argues that the department has discretion to consider the public interest when deciding to expand the PBU under the PBUA and department regulations.

We first consider the text of the PBUA. We then look at extrinsic evidence.

### 1. *The text of the PBUA*

Article 9.1 of the PBUA discusses possible expansion of the PBU:

> The Unit Area may be enlarged from time to time so as to include any additional lands reasonably determined to be within any Reservoir any portion of which is within the Unit Area. The lands to be included shall be based on such subdivisions of the public land surveys as may be approved by the Director, but not less than the area approved by the well-spacing order affecting such lands for such Reservoir....

Exxon argues that the first sentence indicates that Exxon may enlarge the unit area, so long as the additional lands meet the condition. The state argues that the first sentence is ambiguous, but the rest of the PBUA indicates that the department has the power to expand the PBU.

The state is correct that the language is ambiguous. The passive voice can be ambiguous.[20] The text alone does not indicate whether Exxon or the department has the authority to expand the PBU. However, the subsections following the contested statement help to clarify it. Subsections (a) through (d) indicate the process for expansion of the PBU. The final step indicates that "after due consideration of all pertinent information, the Director shall render his decision." This text, and the absence of text

---

**18.** *Betz v. Chena Hot Springs Group,* 657 P.2d 831, 835 (Alaska 1982); *see also Earth Movers, Inc. v. State, Dep't of Transp. & Pub. Facilities,* 824 P.2d 715, 717–18 (Alaska 1992) (interpreting contract based on document as a whole).

**19.** Concerning the contraction decision, for example, the parties dispute: the meaning of the PBUA text; whether the director's amended 1987 deferral superceded the PBUA contraction provisions; whether the lessees met the condi-

tions of the 1987 deferral; and whether the director granted a second deferral.

**20.** *See Plate v. State,* 925 P.2d 1057, 1065 (Alaska App.1996) (finding evidence rule in passive voice ambiguous and resolving ambiguity by resort to commentary to rules); *see also E.I. du Pont de Nemours and Co. v. Train,* 430 U.S. 112, 128, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977) (resorting to other portions of federal statute to resolve ambiguous passive language).

indicating that Exxon was meant to have the right to expand, strongly favors the state's interpretation that the director has the authority to decide expansion of the PBU.

Both sides argue that the use of the permissive "may" supports their interpretation. Exxon argues that the permissive had to be used to preserve Exxon's option of expansion. If the mandatory "shall" was used, Exxon would have been required to expand the PBU if the condition was met.

The state contends that use of the permissive indicates the department's discretion. The state notes that in four other articles of the PBUA, Articles 4.4, 5.4, 16.4, and 18.1, when the agreement intended to create a right that could be exercised by the lessees, it used the language "shall have the right" or "shall be entitled to."

 The state's interpretation is the most logical. In interpreting a contract, courts should "interpret the contract in a manner that makes the contract internally consistent." [21] Exxon's interpretation that Article 9.1 creates a right to expansion with the language "may" conflicts with other portions of the PBUA that use "shall have the right" or "shall be entitled to" to create a lessees' right.

Finally, the state notes that Article 12.1 of the PBUA expressly indicates that the PBUA "shall be subject to all valid applicable federal and state laws, rules, regulations and orders." Former 11 AAC 83.340 and former 11 AAC 83.345, state regulations in effect at the time the parties entered the PBUA, required the director's approval, based on a determination of necessity or advisability in the public interest, for a modification of an approved unit agreement.[22] Accordingly, the state argues that the PBUA required the director's approval for any modification of the agreement. Exxon has no response to

this. This express statement also favors the state's interpretation that the department has discretion to deny expansion of the PBU. In sum, the text of the PBUA strongly indicates that the department had discretion to deny expansion as specified by its own regulations.

### 2. Extrinsic evidence

Extrinsic evidence provides substantial support for the commissioner's decision. The parties' course of performance of the PBUA and the existence of departmental regulations that are inconsistent with Exxon's view of the PBUA strongly support the conclusion that the department had discretion to deny expansion of the PBU.

#### a. Exxon's and the department's course of performance

The state argues that Exxon's and the department's course of performance of the PBUA shows that Exxon understood that the department retained discretion. Exxon offers no argument in response.

 The conduct of the parties is properly considered as evidence of the parties' intent.[23] In the course of performance of the PBUA, Exxon has previously requested contraction of the PBU and corresponding expansion of another unit. Exxon's application for the change in the PBU requested the director's approval under provisions including 11 AAC 83.301–.395 and argued that the change was in "the public interest in accordance with AS 38.05.180(p) and 11 AAC 83.303." Exxon has also requested expansion of the PBU and contraction of another unit. In both cases, the director's decisions to grant the change included an analysis of the best interests factors listed in 11 AAC 83.303.

A unit agreement will be approved by the director if he determines that the agreement is necessary or advisable in the public interest, is for the purpose of more properly conserving natural resources, and adequately protects all parties in interest including Alaska.

**21.** *Brobeck, Phleger, & Harrison v. Telex Corp.,* 602 F.2d 866, 872 (9th Cir.1979).

**22.** Former 11 AAC 83.345 (eff. 9/20/74) provided: Any modification of an approved unit agreement is subject to the director's approval in the same manner and upon the same determination as the original unit agreement.
Former 11 AAC 83.340 (eff. 9/20/74) provided in relevant part:

**23.** *See, e.g., Peterson v. Wirum,* 625 P.2d 866, 872–74 (Alaska 1981).

Furthermore, Exxon's application for the Pt. McIntyre expansion—the denial of which forms the main issue here—requested the director to expand the PBU "pursuant to the provisions of Section 5.3 and Section 9.1 of the [PBUA] and 11 AAC 83.351 and 11 AAC 83.356." The application expressly noted that the expansion "meets the criteria of 11 AAC 83.303" and listed three reasons. Exxon's and the department's prior course of performance of the PBUA contradicts Exxon's current position and strongly indicates that the department had discretion to deny expansion.

### b. The department's inability to contract around its regulations

■ Exxon argues that the department's own regulations allow the department to enter contracts that differ from existing regulations and provide that later-enacted regulations will not apply to preexisting contracts.[24] It also notes that the department has no statutory authority to alter a unit agreement without consent by the contracting parties.[25] Exxon claims that it drafted the PBUA to eliminate the department's discretion. Why, Exxon asks, would it draft an agreement that simply restates the department's regulations?

We disagree with Exxon's first contention—that the department can agree to contract terms that violate its regulations. The only authority cited for this proposition is 11 AAC 83.301(b), which states that the department's regulations "apply to an existing oil and gas lease or approved unit agreement where not inconsistent with the lease or unit agreement or regulations in effect on the

effective date of the lease or unit agreement." This merely applies the department's later-enacted regulations as default rules to existing leases or unit agreements when there is no conflict.

Subsection .301(b) does not make existing department regulations inapplicable to new unit agreements. Former 11 AAC 83.340 and .345 existed before the approval of the PBUA. Former section .345 stated that "[a]ny modification of an approved unit agreement is subject to the director's approval in the same manner and upon the same determination as the original unit agreement."[26] Former section .340 required that "[a] unit agreement will be approved by the director if he determines that the agreement is necessary or advisable in the public interest, is for the purpose of more properly conserving natural resources, and adequately protects all parties in interest including Alaska."[27] Thus, 11 AAC 83.301(b) does not affect the applicability of the best interests analysis for expansions of the PBU according to former 11 AAC 83.340 and .345.[28]

Moreover, 11 AAC 83.301(b) does not confer authority for the converse: to contract outside of the department's regulations. To allow such activity would be arbitrary; parties contracting with the department would not be held to the same regulations that noncontracting parties were required to comply with. And the department should never need to contract in violation of its own regulations, because it has the authority to change its regulations so long as the new regulation has a reasonable basis and is within the scope of the legislature's delegation of power to the department.[29] Because we con-

24. See 11 AAC 83.301(b) (1996) ("[The unitization regulations] apply to an existing oil and gas lease or approved unit agreement where not inconsistent with the lease or unit agreement or regulations in effect on the effective date of the lease or unit agreement.").

25. See AS 38.05.180(p) ("The commissioner may, with the consent of the holders of leases involved, establish, change or revoke drilling, producing, and royalty requirements of the leases and adopt regulations with reference to the leases, with like consent on the part of the lessees, in connection with the institution and operation of a cooperative or unit plan as the commissioner

determines necessary or proper to secure the proper protection of the public interest.").

26. Former 11 AAC 83.345 (eff. 9/20/74).

27. Former 11 AAC 83.340 (eff. 9/20/74).

28. When the department repealed 11 AAC 83.340 and .345 on June 28, 1981, the department adopted 11 AAC 83.303, which contained a similar (but more detailed) consideration of "the public interest" in approving changes to unit agreements. 11 AAC 83.303 (1996).

29. See United Steelworkers of America Local Union 14534 v. NLRB, 983 F.2d 240, 244–45

clude that 11 AAC 83.301(b) does not allow the department to contract outside of its regulations, Exxon's argument that the department contracted away its regulatory discretion fails.

In sum, the text of the PBUA and the extrinsic evidence support the conclusion that the department had discretion to deny expansion. The department did not, and could not, contract away its discretion to consider the state's best interests in approving expansions of the PBU. Exxon did not have a unilateral right to expansion under the PBUA.

C. *The Commissioner's Decision To Deny Expansion Because of the Excessive Field Cost Allowance Did Not Violate the 1980 Royalty Settlement Agreement.*

Exxon argues that the department's failure to expand the PBU violated the 1980 settlement because the 1980 settlement's resolution of field costs expressly applied to all lands covered by the PBUA "and, in addition, all other land to which the [PBUA] may hereafter be extended as therein provided."

Exxon's argument is premised on its interpretation of the PBUA that Exxon had a unilateral right to expand the PBU if the geologic condition was met. If the department had the discretionary authority to deny expansion, Exxon had no right to force application of the 1980 settlement to lands outside the PBU, and the argument fails. Consistent with our previous conclusion that Exxon had no unilateral right to expansion of the PBU, we conclude that the commissioner did not breach the 1980 settlement.

Exxon argues further that the department breached the implied covenant of good faith and fair dealing of the 1980 settlement because the department's failure to allow expansion deprived Exxon of the benefit of its bargain and rendered the settlement a nullity. Exxon argues that for the commissioner to decide as he did "*solely because these [field cost] deductions will apply*" deprives it of the benefit it bargained for in the 1980

settlement. (Emphasis in original.) But the commissioner's decision does not support Exxon's argument that was denied solely because field cost deductions applied. The commissioner first stated "that the public interest with respect to non-economic and even some economic matters would be served at least as well if not better by the creation of a new unit as it would by expansion of the PBU to include the [Pt. McIntyre reservoir]." The commissioner expressly disclaimed both that field costs would never be allowed and that the amount paid under the 1980 settlement was a permissible consideration. Rather, the commissioner appeared to be concerned that Exxon would unfairly profit by overcharging field costs. According to his calculations, Exxon's actual field cost expenses were in the range of six to seventeen cents per barrel, far less than the seventy-nine cents per barrel allowed by the 1980 Royalty Settlement Agreement. The commissioner requested that Exxon justify the magnitude of the field cost, but Exxon did not respond. Presumably, if Exxon could show special production costs that warranted the substantial field costs, a deduction may have been allowed. The commissioner also noted the unfairness of allowing Exxon, but not other similarly situated lessees, a field cost deduction. The commissioner did not deny PBU expansion solely because the field costs would apply.

■ Exxon also argues that the department's consideration of field costs in the denial of expansion rendered the 1980 settlement a nullity. If the 1980 settlement only concerned field costs deductions for production from expansions of the PBU, the problems of illusory contracts and lack of consideration might arise as Exxon argues. But the 1980 settlement applies primarily to existing PBU production, and Exxon has enjoyed a substantial and continuing benefit from the 1980 settlement-a field cost deduction of seventy-nine cents per barrel of oil produced from the PBU. Exxon's claim that "no rational settling party would agree" to the 1980 settlement if its field cost allowance

(D.C.Cir.1993) ("An agency may alter its interpretation of substantive law so long as its new interpretation does not conflict with the statute, and so long as the agency supplies a 'reasoned analysis' for 'changing its course.'" (citation omitted)).

were limited to the existing PBU is quite unpersuasive given the facts that the legislature expressly declared that paying field costs was not in the best interests of the state,[30] that most unit agreements did not allow for field costs deductions,[31] and that Exxon's co-lessees for the disputed tracts waived their rights to any field cost deductions. Accordingly, we conclude that the department breached neither the express terms of the 1980 settlement nor its implied covenant of good faith and fair dealing by exercising discretion to consider the public interest in denying expansion of the PBU.

### D. The State Did Not Violate Exxon's Constitutional Rights.

Exxon argues that the department's regulations unconstitutionally impair the obligations of contracts. This argument is premised on its interpretation of the PBUA. Because the department bargained away its discretion to change the PBU in the PBUA, Exxon argues, applying regulations that reinstate that discretion impairs the PBUA.

In addition, Exxon argues that the department's requirement that Exxon waive its right to field cost deductions under the PBUA for Pt. McIntyre production is an unconstitutional taking. Again, this argument is premised on Exxon's interpretation of the PBUA. For there to be a taking, Exxon must have a property interest in the field cost deduction for production from lands that may be added to the PBU.[32] In turn, this requires that Exxon have a right to expansion of the PBU to include these lands.

The state argues simply that the department did not violate any of Exxon's contractual rights because the department has discretion to deny expansion and order contraction under the PBUA. First, because the department did not bargain away its

discretion to change the PBU, it has not impaired the contract by using its discretion to deny the changes to the PBU. Second, Exxon has no right to expansion under the PBUA; thus, it has no property right in a field cost deduction from lands that only might be added to the PBU.

■ As we determined previously, the state has the discretionary authority under the PBUA to approve changes to the PBU. Exxon's constitutional arguments therefore fail.

### E. The Department Is Not Equitably Estopped from Denying Expansion or Ordering Contraction of the PBU.

Exxon argues that the state should be estopped from ordering contraction and denying expansion of the PBU because Exxon detrimentally relied upon the department's alleged agreement in the PBUA to expand and contract the PBU based solely on geologic factors and without exercise of its discretion. The state argues that the commissioner found the evidence insufficient to establish estoppel and that his finding is supported by substantial evidence.

We have stated that estoppel may apply against the government and in favor of a private party if four elements are present: "(1) the governmental body asserts a position by conduct or words; (2) the private party acts in reasonable reliance thereon; (3) the private party suffers resulting prejudice; and (4) the estoppel serves the interest of justice so as to limit public injury."[33] Whether estoppel applies in any given situation is a legal conclusion.[34]

■ Like Exxon's constitutional arguments, its estoppel argument hinges on its interpretation of the PBUA. Because we conclude that the department has discretion

---

**30.** See AS 38.05.180(f)(2) (enacted 1978).

**31.** The department allowed field cost deductions for the Duck Island Unit ("Endicott"), signed before the 1980 Settlement, and the Kuparuk River Unit. All other unit agreements did not allow field cost deductions. See, e.g., the Milne Point Unit; the North Star Unit; and the Thetis Island Unit.

**32.** See Bowen v. Public Agencies Opposed to Soc. Security Entrapment, 477 U.S. 41, 55–56, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986).

**33.** Crum v. Stalnaker, 936 P.2d 1254, 1256 (Alaska 1997).

**34.** See id. at 1258 ("We determine that the Board erred in its legal conclusion that equitable estoppel is unavailable under the facts of this case.").

under the PBUA, Exxon has not been prejudiced by the department's use of its discretion to deny the expansion to the PBU. Thus, estoppel does not apply here.

## V. *CONCLUSION*

The commissioner had discretionary authority to deny expansion of the PBU. For that reason, and because the decision to deny expansion did not violate the 1980 Royalty Settlement Agreement, the decision did not violate Exxon's constitutional rights, and the department was not equitably estopped from making that decision, we AFFIRM in all respects.

APPENDIX "A"