Law Offices of James B. GOTTSTEIN,
Appellant,

v.

STATE of Alaska, DEPARTMENT OF
NATURAL RESOURCES, Division
of Oil & Gas, Appellee.

Monte J. Allen and Daniel K.
Donkel, Appellants,

v.

State Of Alaska, Department of Natural
Resources, Division of Oil & Gas,
Appellee.

Nos. S–12942, S–13096.

Supreme Court of Alaska.

Jan. 22, 2010.

**610** 

James B. Gottstein, Law Offices of James B. Gottstein, Anchorage, for Gottstein, Appellant.

Christopher M. Brecht and William M. Bankston, Bankston Gronning O'Hara, P.C., Anchorage, for Donkel and Allen, Appellants.

Richard J. Todd, Senior Assistant Attorney General, Anchorage, Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

Interest holders in an oil and gas lease appealed to the superior court from three final agency decisions relating to the lease. The superior court affirmed the agency decisions and the interest holders separately appealed to us, arguing that: (1) they were wrongfully denied an agency hearing on the first agency decision; (2) the first agency decision is insufficient for appellate review and otherwise lacks sufficient findings or a reasonable basis; (3) the other agency decisions should be set aside because of the deficiencies in the first agency decision; and (4) the superior court should have conducted a trial de novo on the agency decisions. We consolidated the separate appeals and now address the appellants' contentions below, affirming the superior court's decision to uphold the agency decisions without a trial de novo.

## II. FACTS AND PROCEEDINGS

### A. Facts and Administrative Proceedings

This case arises from a Cook Inlet oil and gas lease issued by the State of Alaska, Department of Natural Resources (DNR), Division of Oil and Gas (DO & G), designated ADL 369116.

In 1964 DO & G certified a well on what later became ADL 369116 as capable of producing gas in paying quantities. Rather than comply with an order to place the lease in production, the lessee instead plugged and abandoned the well and let its lease expire.

DO & G issued another lease for the area in 1981, but that lessee relinquished the lease after three years.

After competitive bidding, DO & G awarded ADL 369116 to Danco Inc. effective September 1, 1986. The lease gave Danco "the exclusive right to drill for, extract, remove, clean, process, and dispose of oil, gas and associated substances" for "an initial primary term of 10 years. . . ." [1]

In 1988 Danco assigned one hundred percent of the working interest [2] in ADL 369116 to Amoco Production Company, subject to a reserved overriding royalty interest.[3] In 1990 Danco assigned a portion of its overriding royalty interest to Monte Allen. Also in 1990, Amoco assigned its entire working interest in ADL 369116 to Union Oil Company of California (Unocal). In 1994 Unocal assigned the entire working interest in ADL 369116 back to Danco. No actual exploratory or development efforts were undertaken on ADL 369116 between 1986 and 1994.

In 1995, about one year before the expiration of ADL 369116's August 31, 1996, primary term, Danco and Unocal agreed to create a working unit [4] covering ADL 369116 and Unocal's adjacent lease ADL 17595.[5] As a part of this agreement Danco re-assigned its entire working interest in ADL 369116 to Unocal. By this time portions of Danco's overriding royalty interest had been assigned not only to Allen, but also to Danco's president, Daniel Donkel, and other individuals in varying proportions. All of the assignees consented to the proposed unit agreement. In June 1996 Unocal proposed a standard-form unit agreement [6] to combine the two leases into the North Middle Ground Shoals Unit (NMGS Unit), except that the term of the proposed unit agreement was two years instead of the standard five years.

On August 30, 1996, the day before ADL 369116's primary term was due to expire, the

---

1. The following summarizes conditions under which the lessee could have extended the primary term or entered a secondary term: (a) oil or gas being produced in paying quantities from the lease area; (b) the lease being committed to and remaining in a state-approved unit agreement; (c)(1) commencing drilling by the end of the primary term and continuing drilling with reasonable diligence (well completion clause); (c)(2) commencing diligent drilling or reworking operations within six months of production cessation (temporary cessation of production clause); (d) failing to produce oil or gas in an area that could produce in paying quantities if the state gave no notice requiring production; (e) the state suspending operations or production in the lease area; or (f) failing to produce or to perform specific actions because of an unanticipated natural cause (force majeure clause).

2. An agency regulation explains: " 'working interest' means the interest held in lands by virtue of a lease, operating agreement, fee title or otherwise, under which the owner of the interest is vested with the right to explore for, develop and produce minerals; the right delegated to a unit operator by a unit agreement is not a working interest." 11 Alaska Administrative Code (AAC) 88.185(32).

3. An agency regulation explains: " 'royalty interest' means a basic royalty or overriding royalty in the production of oil and gas." 11 AAC 83.295(27). An overriding royalty interest is " 'a percentage of the gross production payable to some person other than the lessor or persons claiming under the lessor.' " *Allen v. Alaska Oil & Gas Conservation Comm'n*, 1 P.3d 699, 700 n.

1 (Alaska 2000) (quoting 38 Am.Jur. 2d *Gas & Oil* § 215 (1999)).

4. Agency regulations explain: " 'unit' means a group of leases covering all or part of one or more potential hydrocarbon accumulations, or all or part of one or more adjacent or vertically separate oil or gas reservoirs, which are subject to a unit agreement" and " 'unit agreement' means the agreement executed by the State of Alaska, working-interest owners, and royalty owners creating the unit." 11 AAC 83.395(7)-(8). We have further explained: "[u]nit agreements and participating areas are organizational schemes approved by the Department of Natural Resources to efficiently extract oil from a common reservoir that is the subject of multiple leases." *ConocoPhillips Alaska, Inc. v. State, Dep't of Natural Res.*, 109 P.3d 914, 917 n. 16 (Alaska 2005).

5. In 1962 DO & G certified a well from the Baker Platform on ADL 17595 as capable of producing in paying quantities. Commercial oil production from the Hemlock Formation and the Lower Tyonek Formation began in 1966, and commercial gas production from the Shallow Tyonek Formation began in 1982.

6. 11 AAC 83.326 (mandating that a unit agreement must be "executed on, or in a manner consistent with, a standard state unit agreement form" and that the Commissioner will modify the standard form only upon request and when "reasonably required to meet the needs and requirements of the particular unit").

DNR Commissioner (Commissioner) approved the formation of the NMGS Unit.[7] This indefinitely extended the lease term for the life of the unit agreement.[8] Under the NMGS Unit's initial plan of development, Unocal committed to (1) continue existing production from ADL 17595, and (2) drill, by August 31, 1998, an exploratory well from the Baker Platform on ADL 17595 to determine whether the Shallow Tyonek Formation gas reserve extended to ADL 369116, which would indicate that ADL 369116 might contribute to gas production in paying quantities.

In January 1998 Unocal requested an extension of the August 31, 1998, deadline for completing the exploration required under the NMGS Unit agreement. Unocal had drilled the required exploratory well from the Baker Platform in 1997, but was concerned that it could not test the well nor justify allocation of production to ADL 369116 by the August 31, 1998, deadline. Unocal agreed that in exchange for the extension, it would acquire a three-dimensional seismic survey of the NMGS Unit by August 31, 1998, and, by December 31, 1999, drill an exploratory well on ADL 369116 to determine whether the Hemlock Formation oil reserve extended under that lease area.

In February 1998 the extension was granted with the specific conditions that if the seismic survey of the NMGS Unit was not completed by the deadline, or the new ex-

ploratory well on ADL 369116 was not drilled by the deadline, ADL 369116 would be terminated and eliminated from the NMGS Unit. DO & G allowed Unocal to complete its testing program for the exploratory gas well from the Baker Platform and to apply to establish a gas participating area[9] with production allocated to ADL 369116, but DO & G expressly advised Unocal that those actions would "not satisfy the obligation to drill the exploratory well" on ADL 369116.

Unocal claimed it completed the required NMGS Unit seismic survey by August 31, 1998. In October 1998 Unocal applied to DO & G to form the Shallow Tyonek Gas Reservoir Participating Area. The application proposed a participating area covering both leases in the NMGS Unit. In June 1999 DO & G approved the application for a participating area that included portions of ADL 17595 but excluded all of ADL 369116. DO & G found the presented data failed to support Unocal's contention that gas reserves under ADL 369116 could be reached by wells from the Baker Platform on ADL 17595. DO & G noted that if Unocal fulfilled its commitment to drill the exploratory well on ADL 369116 by December 31, 1999, it might acquire additional gas reserves information justifying expansion of the participating area to cover some or all of ADL 369116. DO & G also stated that if Unocal failed to meet its drilling obligation by December 31, 1999, ADL 369116 would "expire and be eliminated from" the NMGS Unit.

7. Unocal was designated the unit operator and accepted the obligation to conduct the unit operations and explore for, develop, and produce oil and gas. Although Unocal already held the working interest in both ADL 17595 and ADL 369116, under the unit agreement the working interest holders delegated to Unocal "the exclusive rights and obligations of the Working Interest Owners to explore for, develop, and produce" oil and gas in the NMGS Unit. However, this delegation was expressly subject to the lessee's "obligation to comply with all lease terms."

8. See note 1, above.

9. An agency regulation defines "participating area" as "that part of an oil and gas lease unit area to which production is allocated in the manner described in a unit agreement." 11 AAC 88.185(21). Another agency regulation, 11 AAC 83.351, provides in pertinent part:

The participating area may include only the land reasonably known to be underlain by hy-

drocarbons and known or reasonably estimated through use of geological, geophysical, or engineering data to be capable of producing or contributing to production of hydrocarbons in paying quantities. If any portion of a lease is included in a participating area formed under a unit agreement, the entire leased land will be committed to the unit and the lease will not be severed. Under 11 AAC 83.371(a), the unit operator also shall submit to the commissioner for approval of a proposed division of interest or formula setting out the percentage of production and costs to be allocated to each lease or portion of lease within the participating area. Upon approval by the commissioner, the area of productivity constitutes a participating area.

See also Exxon Corp. v. State, 40 P.3d 786, 788 n. 4 (Alaska 2001); see generally note 4, above (defining unit and unit agreement).

In July 1999 Unocal appealed DO & G's decision to exclude ADL 369116 from the participating area to the Commissioner. In August 1999 Unocal proposed an amended plan of exploration for the NMGS Unit, requesting more time to evaluate the three-dimensional seismic survey and to drill the exploratory well on ADL 369116. DO & G denied the request in early September 1999. DO & G explained that (1) despite Unocal's October 1998 representation that it had completed a NMGS Unit seismic survey, Unocal failed to include a survey interpretation in its October 1998 participating area application, and (2) in the August 1999 request to amend the plan of exploration, Unocal claimed it lacked access to that seismic survey and needed three additional years to "obtain and evaluate the seismic data and drill the exploratory well on ADL 369116." DO & G concluded by stating that "[t]he lease has now been in effect for thirteen years with no evaluation of its hydrocarbon reserves" and "DNR is not willing to extend the lease term to more than fifteen years without exploration of the lease area." DO & G reiterated the critical date, December 31, 1999, by which Unocal was required to drill an exploratory well to maintain ADL 369116 as part of the NMGS Unit and avoid ADL 369116's expiration.

In early November 1999 Unocal again applied to amend the NMGS Unit plan of exploration and extend the term of ADL 369116. Unocal again asserted that it had fulfilled its seismic survey obligation under the 1998 amendment and extension agreement for the NMGS Unit. But Unocal admitted it had not met, and would not meet, the December exploratory well deadline due to "[c]hanging economic, logistical and current events, which were beyond Unocal's control...."

Unocal explained that when it asked in 1998 for an extension of ADL 369116's term, it was relying on another company's plan to bring a "jack-up rig" to Cook Inlet and conduct "an extensive seismic program" in the inlet. Unocal stated it had planned to participate in the seismic program and, subject to analysis of its seismic survey, had been prepared to use the jack-up rig to drill the required exploratory well on ADL 369116.

Although Unocal did not explain why the jack-up rig had not materialized, it stated that given advances in technology another platform method of drilling might better suit the area, that the other company planned to use this new platform method elsewhere in Cook Inlet, and that until the new platform method of drilling was tested it would "be unwise for Unocal to commit to another platform for [the NMGS Unit]." Unocal proposed yet another extension framework:

Unocal proposes that the Division of Oil and Gas approve a revised Plan of Exploration with the following terms and conditions. If Unocal fails to meet any of the following conditions, Unocal will surrender ADL–369116, on the date that Unocal fails to meet the condition.

1. Unocal will complete a post-stack merge and re-migration of Baker 3D and NMGS 3D seismic by December 31, 2000, to improve the imaging and regional understanding of the geology.

2. Unocal or its co-working interest owner, Forcenergy, will by December 31, 2000, set a new exploration platform at the Redoubt Shoals Unit to test the new platform application in Cook Inlet.

3. Unocal and Forcenergy, will by December 31, 2001, commit to either the orderly procurement of a new platform, or move the Osprey platform, or other Cook Inlet Platform to the [NMGS Unit]. We will however, through this time period, continue to analyze the application, availability and viability of using a jack-up or floating vessel.

In January 2000, after giving Unocal several opportunities to provide additional information about gas reserves under ADL 369116, the Commissioner (then John Shively) affirmed DO & G's decision to exclude ADL 369116 from the participating area. Without specifically responding to Unocal's November 1999 extension request, DO & G issued a notice terminating ADL 369116 and the NMGS Unit.

Unocal did not appeal to the superior court from the Commissioner's final decision on the participating area, but Donkel and other overriding royalty interest holders in ADL

369116 did, arguing that (1) they were entitled to, but did not receive, notice and an opportunity to be heard prior to the Commissioner's decision, and (2) there was insufficient evidence to support the decision to exclude ADL 369116 from the participating area. Because the ultimate consequence of the Commissioner's decision was the termination of ADL 369116 and because DNR indicated it intended to include that lease area in an upcoming lease sale, Donkel and the other overriding royalty interest holders moved for and received from the superior court a stay of the Commissioner's decision.

In August 2000 DO & G violated the superior court's stay order by including a portion of ADL 369116 in a competitive oil and gas lease sale. In April 2001 DO & G issued a partially conflicting lease to Richard Wagner. After realizing its error, DO & G revoked Wagner's lease in June 2001. Wagner gave the Commissioner a one-page notice of appeal, stating an "intent to submit additional written material to the Department within 20 calendar days after the filing of this appeal." Wagner never filed additional materials and his putative appeal lay dormant.

In March 2002 the superior court decided the appeal in favor of Donkel and the other overriding royalty interest holders on the issue of notice, remanding the case to DO & G to "reconsider whether the ... Participating Area originally proposed by Unocal should be approved." The parties then reached a settlement agreement that was approved by the superior court in December 2002.

The settlement agreement specifically required DO & G to reinstate ADL 369116 and to redefine the NMGS Unit to include both ADL 17595 and ADL 369116, which it did effective December 2, 2002. ADL 369116's lease term was therefore extended, but Unocal was required to: (1) commit to drilling an exploratory oil well on ADL 369116 by October 31, 2003; (2) begin drilling that well by December 31, 2004; and (3) "complete, suspend, or abandon" that well by December 31, 2005. If either the commitment to drill or the commencement of drilling did not occur by the stated deadlines, Unocal was to transfer its working interest to Donkel and others. If the ultimate drilling deadline was not met, ADL 369116 was to terminate on December 31, 2005.

In August 2003 Unocal submitted to DO & G its revised NMGS Unit plan of development and operations for June 2003 through May 2004 (2003 POD). Unocal stated that the NMGS Unit "has reached its economic limit and is depleted." Unocal further stated its "intention to remove the drilling rig from the [Baker Platform,] shut in all producing wells, clean the surface equipment ... leave all producing and water injection wells shut-in as is, and light house the facility by October 2003."[10] Unocal described its past efforts to market the Baker Platform and related facilities and stated that additional development was unwarranted based on this experience. Unocal did state that it was continuing "to analyze and explore the feasibility of mobilizing a drill ship" for the test well still required for ADL 369116, which it acknowledged "must occur for Unit maintenance." DO & G approved Unocal's 2003 POD in late August 2003.

In October 2003, in accordance with the 2002 settlement agreement, Unocal notified DO & G that it would not commit to drilling on ADL 369116 and that its working interest in that lease was being assigned to Donkel, Robert Bolt, and George Kasper. Unocal noted that it was aware of both the drilling deadline for ADL 369116 and the prospective December 31, 2005, termination of ADL 369116 if drilling did not occur, and further represented that it was providing this information to its working interest assignees. ADL 369116 remained a part of the NMGS Unit and Unocal retained both its status as the NMGS Unit operator and its working interest in ADL 17595.

In February 2004 Unocal submitted to DO & G its proposed NMGS Unit plan of development and operations for the period from

---

**10.** In the context of Cook Inlet oil and gas infrastructure, "lighthouse mode" means "wells shut in, production facilities cleaned, decommissioned but not removed, and navigational aids intact."

Dep't of Envtl Conservation, Comprehensive Evaluation & Risk Assessment of Alaska's Oil & Gas Infrastructure, Proposed Risk Assessment Methodology, Rev. 1 (2009)

June 2004 through May 2005 (2004 POD). Unocal noted that no development activity occurred in 2003, the Baker Platform was "decommissioned" and "presently in lighthouse mode," and it did "not intend to perform any development activities during the plan period." Unocal stated that the entire working interest in ADL 369116 had been assigned to Donkel, Bolt, and Kasper, and that they were advised of the December 31, 2005, drilling deadline. Unocal concluded by stating that "the new working interest owners ... have not advised the Operator (Unocal) of any plans to drill the Initial Test Well during this Plan period." [11] In May 2004 DO & G approved Unocal's 2004 POD for the NMGS Unit, reminding Unocal: "If the Initial Test Well is not drilled as specified in the Court Order, the NMGS Unit Agreement and ADL 369116 will automatically terminate effective December 31, 2005."

In June 2004 attorney James B. Gottstein wrote a letter to the Commissioner (then Thomas Irwin) on behalf of Donkel, Bolt, and Kasper: (1) complaining that DO & G's letter had not been sent to the new working interest holders of ADL 369116; (2) stating that if the termination reminder was a final decision on the termination of ADL 369116, the working interest holders were appealing that decision; and (3) alleging past bad faith by DO & G in failing to correct its lease of a portion of ADL 369116 to Wagner. As to the Wagner lease issue, Gottstein further stated:

11. Under the unit agreement:
 Any Working Interest Owner shall be entitled to drill wells on the unitized portion of its lease when the Unit Operator has declined to drill such wells, so long as such activities are conducted under an approved permit to drill and a plan approved under Article 8 [Plans of Exploration, Development, and Operations] of this Agreement.
 . . . .
 No exploration, development, or production activities may be commenced or conducted on the Unit Area except in accordance with an approved plan.

12. A few days after writing this letter, Gottstein's law office received, as payment for legal services in another matter, assignments from Donkel, Bolt, and Kasper totaling a 1.5% overriding royalty interest in ADL 369116. For ease of reference, we will refer to this interest holder as "Gottstein." DO & G was not notified of these assignments until June 2005; Gottstein did not record his assignments until March 2006.

The problem is real because it is my understanding a company decided against a drilling program in Cook Inlet to include ADL 369116 because of the cloud on title created by the Division. My understanding is that not only was ADL 369116 affected, but that drilling of another lease is not occurring because of the continuing cloud on ADL 369116's title created by the Division. [12]

In August 2004 DO & G responded to Gottstein at the request of the Commissioner. DO & G clarified that (1) its May 2004 decision was an approval of Unocal's 2004 POD for the NMGS Unit, not a termination of ADL 369116, and (2) notice of the approval was given only to Unocal because Unocal was the NMGS Unit operator and therefore represented the other working interest holders in the NMGS Unit. [13] DO & G also reminded Gottstein that it had revoked Wagner's lease in June 2001 after DO & G became aware of its mistake. Later that month the Commissioner issued Wagner a letter formally upholding DO & G's 2001 revocation of his lease and giving notice of the right to appeal to the superior court within thirty days. Wagner took no further action.

In October 2004 Unocal requested that the Alaska Oil and Gas Conservation Commission (AOGCC) approve the abandonment of wells from the Baker Platform on ADL 17595. [14]

13. The unit agreement provided that as the unit operator Unocal had exclusive control over unit operations and was required to notify other working interest holders of all of its actions. The unit agreement also provided that "[a]ny order or notice relating to this Agreement which is given to the Unit Operator of record shall be deemed given to all Working Interest Owners in the Unit Area."

14. The AOGCC is an "independent quasi-judicial agency of the state" created by the Alaska Oil and Gas Conservation Act. AS 31.05.005(a). The AOGCC, which has authority over all land subject to the state's police power, regulates to prevent waste, insure greater recovery, protect correlative rights and underground water, and further public health and safety. *See* AS 31.05.027; AS 31.05.095; AS 31.05.100; AS 31.05.110; AS 31.05.030.

Unocal noted that oil and gas production from the Baker Platform had been suspended since August 2003 and that alternatives for returning the wells to production had been unsuccessful. Unocal proposed a formal abandonment plan. AOGCC replied that the formal plan appeared to comply with relevant regulations, but encouraged Unocal to explore options to transfer the facilities to another operator.

In February 2005 Unocal submitted to DO & G its proposed plan of development and operations for the NMGS Unit for the period from June 2005 through May 2006 (2005 POD). Unocal stated that there had been no developmental drilling in the NMGS Unit during the 2004 plan year, Unocal did not intend to perform any development activities during the 2005 plan year, and the Baker Platform had been decommissioned during the 2002 plan year and was in lighthouse mode. After noting the December 31, 2005, deadline for drilling the exploratory well on ADL 369116, Unocal stated that the three working interest holders of ADL 369116 had "not advised the Operator (Unocal) of any plans to drill the Initial Test Well during this Plan period."[15] Unocal stated that it had been unable to find an operator or purchaser for the Baker Platform and related facilities and that it intended to follow its abandonment plan, ultimately removing the Baker Platform if necessary.

DO & G approved Unocal's 2005 POD for the NMGS Unit in late March 2005. DO & G reiterated the 2002 settlement agreement term requiring the initial test well on ADL 369116 to be completed by December 31, 2005, or ADL 369116 and the NMGS Unit would terminate effective that date. But DO & G expressly acknowledged that if Donkel, Bolt, and Kasper fulfilled the drilling commitment by December 31, 2005, the NMGS Unit (and therefore ADL 369116) would not automatically terminate.[16]

In April 2005 Donkel and Allen separately appealed to the Commissioner from DO & G's approval of Unocal's 2005 POD for the NMGS Unit, identically claiming that: (1) the plan to abandon the Baker Platform and its related facilities would have a "negative impact on the rights and interests and opportunity to explore, drill and develop ADL 369116"; and (2) the partially conflicting Wagner lease had "unreasonably and unfairly disrupted and interfered with" the working interest holders' ability "to fulfill the drilling commitment." They noted, as to disputed material facts, that "[w]ithout the ability to review information and data consulted and relied upon in connection with the various abandonment activities, satisfaction and compliance with various criteria in 11 AAC § 83.303 can not be confirmed and verified."[17] They requested a hearing and a

---

**15.** See note 11, above.

**16.** Before DO & G issued its decision, Donkel, Bolt, and Kasper assigned their working interests in ADL 369116 to Renaissance Resources, Alaska, LLC. The assignments were not approved until August 2, 2005, effective August 1, 2005.

**17.** 11 AAC 83.303 provides:

(a) The commissioner will approve a proposed unit agreement for state oil and gas leases if he makes a written finding that the agreement is necessary or advisable to protect the public interest considering the provisions of AS 38.05.180(p) and this section. The commissioner will approve a proposed unit agreement upon a written finding that it will

(1) promote conservation of all natural resources, including all or part of an oil or gas pool, field, or like area;

(2) promote the prevention of economic and physical waste; and

(3) provide for the protection of all parties of interest, including the state.

(b) In evaluating the above criteria, the commissioner will consider

(1) the environmental costs and benefits of unitized exploration or development;

(2) the geological and engineering characteristics of the potential hydrocarbon accumulation or reservoir proposed for unitization;

(3) prior exploration activities in the proposed unit area;

(4) the applicant's plans for exploration or development of the unit area;

(5) the economic costs and benefits to the state; and

(6) any other relevant factors, including measures to mitigate impacts identified above, the commissioner determines necessary or advisable to protect the public interest.

(c) The commissioner will consider the criteria in (a) and (b) of this section when evaluating each requested authorization or approval under 11 AAC 83.301–11 AAC 83.395, including

(1) an approval of a unit agreement;

(2) an extension or amendment of a unit agreement;

two-year extension of ADL 369116's lease term.

Within days of the appeals the Commissioner denied the hearing requests by noting that all of the information DO & G consulted and relied upon in approving the NMGS Unit's 2005 POD was public record and available for review at DO & G's Anchorage office during regular office hours. Neither Donkel nor Allen responded in any fashion. In May 2005 the Commissioner denied the appeals on their merits. The Commissioner stated that the status of the Baker Platform did not adversely influence the ability to drill the required exploratory well on ADL 369116 because: (1) the Baker Platform was too far away to support an exploratory oil well into ADL 369116; (2) even if the Baker Platform were close enough to support an exploratory oil well into ADL 369116, DO & G lacked the authority to compel Unocal to make the Platform available for that purpose; and (3) under the 2005 POD the Baker Platform was to remain in place for several more years. The Commissioner also stated that the Wagner appeal "in no way interfered" with the right to seek agency approval for operations on ADL 369116 after Unocal assigned the working interest in that lease to Donkel and his colleagues. The Commissioner concluded that DO & G "appropriately considered the criteria in 11 AAC 83.303 in its evaluation" of the 2005 POD and that approval of the 2005 POD was "necessary and advisable to protect the public interest."

In June 2005 Gottstein, on behalf of Donkel and Allen, confirmed DO & G's attorneys' clarification that the Commissioner's decision did not terminate ADL 369116. Gottstein advised DO & G's attorneys that the entire working interest in ADL 369116 was in the process of being assigned to Renaissance Resources and that Renaissance Resources would be submitting a lease extension proposal. Gottstein also gave notice of his receipt of assignments of overriding royalty interests in ADL 369116.[18]

(3) a plan or amendment of a plan of exploration, development or operations;
(4) a participating area; or
(5) a proposed or revised production or cost allocation formula.

Days later Renaissance Resources requested an extension of ADL 369116 beyond the upcoming December 31, 2005, termination date. Renaissance Resources admitted it was "unable to commit to any meaningful expenditure at this time" but asserted that if DO & G denied the extension "the owners of the overriding royalty interest will pursue legal remedies that could jeopardize any potential investment for the foreseeable future and preclude leasing at the next sale." At about the same time Donkel and Allen appealed to the superior court from the Commissioner's decision approving Unocal's NMGS Unit 2005 POD and denying their requested remedial extension of ADL 369116.

In August 2005 DO & G deferred Renaissance Resources's lease extension request, expressing a willingness to consider it if "Renaissance submits written documentation of its progress to mobilize a rig to develop the lease." In early December 2005 Renaissance Resources requested a two-year extension of ADL 369116, claiming to be "confident that activity will occur on ADL–369116 in the next two (2) years" and noting that Donkel and Allen had agreed to withdraw their appeal if the extension were granted. Pointing out that "Renaissance has not proposed a plan of development with specific milestones" and "there is no firm commitment to explore the lease," DO & G denied the extension request on December 22, 2005. Renaissance Resources appealed the denial to the Commissioner in January 2006.

Also in January 2006 DO & G notified Unocal that because ADL 369116 terminated effective December 31, 2005, for failure to drill the exploratory well required by the terms of the 2002 settlement agreement, the NMGS Unit terminated as well.[19] In early February 2006 Donkel and Allen appealed to the Commissioner from DO & G's decision to terminate ADL 369116 and the NMGS Unit. Requesting a hearing, they raised four points in their appeal: (1) ADL 369116's termination was the subject of Renaissance Re-

**18.** *See* note 12, above.

**19.** Unocal was directed to continue its annual plans of development for ADL 17595.

sources's appeal to the Commissioner from DO & G's denial of the requested lease term extension; (2) "[i]ssues concerning the terms and provisions of the [earlier settlement agreement] relied upon for the termination of ADL 369116" were the subject of Donkel and Allen's appeal to the superior court from the approval of the 2005 POD for the NMGS Unit; (3) ADL 369116 could not be terminated because there was a well on the lease area capable of producing in paying quantities (apparently referring to the well that DO & G had certified in 1964 and that the original lessee had later plugged and abandoned); and (4) termination of the NMGS Unit and ADL 369116 was not in the State's best interest.

In late February 2006 the Commissioner affirmed DO & G's denial of Renaissance Resources's request for an extension of ADL 369116's lease term. The Commissioner noted that even though gas had been discovered in the lease area in 1964, no exploration or development had taken place since ADL 369116 was issued in 1986. He concluded it was not in the State's best interest to grant an additional lease term extension in the absence of a firm commitment to develop diligently the known gas accumulation underlying the lease area.

In early March 2006 Gottstein executed and recorded his assignments of overriding royalty interests in ADL 369116 but did not submit them to DO & G for approval. Gottstein wrote a letter to the Commissioner the day after recording his interests in ADL 369116, advising of his participation "on my own behalf as an overridding royalty interest owner" and stating that Renaissance Resources "is very close to putting together the financing and other arrangements to be able to commit to drilling a well" on ADL 369116. Gottstein pointed to the pending superior court appeal from the Commissioner's approval of the 2005 POD for the NMGS Unit, suggested ADL 369116 would be tied up in litigation for several years, alleged prior bad faith by DO & G with respect to the Wagner lease issue, and requested the Commissioner grant an extension of ADL 369116. Gottstein stated that in the absence of an extension of ADL 369116, he would appeal to the

superior court from the denial of Renaissance Resources's lease extension request. Renaissance Resources did not appeal to the superior court from the Commissioner's decision upholding the denial of its requested lease extension. Gottstein did.

In April 2006 the Commissioner denied Donkel's and Allen's appeals and affirmed DO & G's January 2006 decision to terminate ADL 369116, and consequently the NMGS Unit, without the requested hearing. The Commissioner focused on the working interest holders' failure to drill the exploratory well as required by the terms of the 2002 settlement agreement and concluded that failure sufficiently supported terminating ADL 369116. The Commissioner did not reach the dispute about the existence of a well capable of producing in paying quantities, but did note that it was in the State's best interest to terminate ADL 369116 and allow it to be re-offered to a party that might follow through with exploring and developing the lease.

Gottstein, and then Donkel and Allen together, appealed to the superior court from the Commissioner's April 2006 final agency decision to terminate ADL 369116.

### B. Superior Court Proceedings

In June 2005 Donkel and Allen filed their appeal from the Commissioner's May 2005 final agency approval of Unocal's 2005 POD for the NMGS Unit and denial of their request to remedially extend ADL 369116 for two years. Donkel and Allen claimed thirteen points on appeal, alleging violations of their Alaska rights of due process, entitlements to an agency hearing, an erroneous decision by the Commissioner, abuse of discretion by DO & G, wrongful inducement by omission of material fact, violation of lease terms by DO & G, harm as a result of the Wagner lease, violations of rights to an impartial tribunal, violations of Alaska's constitutional provision allowing for development of the State's resources, violations of separation of powers, and arbitrary and capricious decisions by DO & G.

In March 2006 Gottstein filed his appeal from the Commissioner's February 2006 final agency decision denying Renaissance Re-

sources's request for an extension of ADL 369116. His points on appeal were as follows:

1. The Decision to terminate Lease ADL 369116 should be reversed and vacated because the Appellee violated its implied covenant of good faith and fair dealing under the settlement agreement in *Donkel et. al., v. Alaska Dept. of Natural Resources,* 3AN–00–3616 CV.

2. The Decision did not comport with the requirements of due process.

In May 2006 Gottstein filed his appeal from the Commissioner's April 2006 final agency decision terminating ADL 369116. Also in May 2006 Donkel and Allen filed their appeal from the Commissioner's April 2006 final agency decision terminating ADL 369116. The points on appeal in both instances were as follows:

1. The Decision to terminate Lease ADL 369116 should be reversed and vacated because the Appellee violated its implied covenant of good faith and fair dealing under the settlement agreement in *Donkel et. al., v. Alaska Dept. of Natural Resources,* 3AN–00–3616 CV.

2. The Decision did not comport with the requirements of due process.

3. The Division failed to follow its regulations and/or rules.

In June 2006 the four appeals were consolidated for all purposes.

Before consolidation Donkel and Allen filed an opening brief in their 2005 appeal and Gottstein moved for a trial de novo in one of his appeals. After consolidation the superior court denied Gottstein's motion for a trial de novo and established a briefing schedule. Gottstein informed the court that he would "not be filing an opening brief, intending instead, if necessary and determined desirable, when ripe, to file an appeal to the Alaska Supreme Court with respect to the denial of [his] motion for a *de novo* trial." Donkel and Allen then informed the court

that they had filed their opening brief in their 2005 appeal and would not be filing anything further as an opening brief.

DNR subsequently filed a motion to dismiss Gottstein's appeals and Donkel and Allen's 2006 appeal for failure to prosecute. Gottstein opposed dismissal, conceding that his earlier notice about not filing a brief was unclear but claiming an intent to rely on the brief submitted by Donkel and Allen. The superior court granted the motion to dismiss Gottstein's appeals and later awarded $1,000 in attorney's fees in favor of DNR and against Gottstein "because Mr. Gottstein, by appealing, caused [DNR] to incur substantial attorneys' fees ($24,559.55), but Mr. Gottstein failed to prosecute the appeal." The superior court denied the motion to dismiss Donkel and Allen's 2006 appeal, permitting Donkel and Allen to rely on their 2005 opening brief for their 2006 appeal but "not allow[ing] them to expand upon their arguments."

Despite the many issues raised in their statement of points on appeal, Donkel and Allen's opening brief for their 2005 appeal was limited to three issues regarding the Commissioner's May 26, 2005, final agency decision approving Unocal's 2005 POD for the NMGS Unit. The issues briefed were whether: (1) the Commissioner violated 11 AAC 02.050(a) [20] or the due process protections of Article 1, section 7 of the Alaska Constitution by denying Donkel and Allen a hearing; (2) the Commissioner's approval of the 2005 POD met the criteria set forth in 11 AAC. 83.303 in accordance with the State's best interest; [21] and (3) the Commissioner's denial of Donkel's and Allen's requests for an extension of ADL 369116's lease term breached express or implied terms of the ADL 369116 lease agreement or the 2002 settlement agreement.

The only issue Donkel and Allen briefed that was common to the points on appeal they and Gottstein raised in their 2006 appeals was whether the Commissioner's refusal to extend ADL 369116's lease term violated implied terms of the 2002 settlement agreement. Thus no briefing was submitted

---

**20.** 11 AAC 02.050(a) provides that "[t]he department will, in its discretion, hold a hearing when questions of fact must be resolved."

**21.** *See* note 17, above.

to support their appeal points regarding violations of DNR rules and regulations or due process rights in connection with the Commissioner's 2006 final agency decisions (1) denying Renaissance Resources's request for an extension of ADL 369116's lease term and (2) terminating ADL 369116.

The superior court upheld the Commissioner's decisions to: (1) not hold a hearing for Donkel's and Allen's appeals from DO & G's approval of the 2005 POD; (2) affirm DO & G's approval of the 2005 POD; and (3) deny Donkel's and Allen's 2005 requests for a two-year extension of ADL 369116. The superior court found all other issues waived "either because they were not asserted at the agency level, or were not briefed to the court." Donkel and Allen moved for reconsideration, but the superior court affirmed its earlier decision.

Donkel and Allen appealed to us from the superior court's decision, as did Gottstein. We consolidated the appeals, and now address the following issues raised and briefed by Donkel and Allen and by Gottstein, specifically whether: (1) the Commissioner erred in not holding an evidentiary hearing for Donkel's and Allen's appeals from DO & G's approval of the 2005 POD for the NMGS Unit; (2) the Commissioner erred in affirming DO & G's approval of the 2005 POD and in denying Donkel's and Allen's remedial requests for an extension of ADL 369116's lease term; (3) the superior court erred in

denying Gottstein's motion for a trial de novo; and (4) the superior court erred in dismissing Gottstein's appeals or in awarding $1,000 in attorney's fees against Gottstein and in favor of DNR.[22]

## III. STANDARD OF REVIEW

■■■ Because the superior court acts as an intermediate court of appeals in administrative decisions we "independently review the merits of the administrative decision."[23] We recognize four standards to review administrative decisions.[24] We apply a substantial evidence standard to questions of fact, a reasonable basis standard to questions of law involving agency expertise, a substitution of judgment standard to questions of law not involving agency expertise, and a reasonable and not arbitrary standard to an agency's interpretation of its own regulations.[25] We will affirm an agency's factual findings if supported by substantial evidence,[26] but what constitutes substantial evidence presents a question of law requiring de novo review.[27]

## IV. DISCUSSION

**A. The Commissioner Was Not Required To Hold a Hearing Before Deciding Donkel's and Allen's Appeals from DO & G's Approval of the 2005 POD.**

■■■ Donkel and Allen argue the Commissioner violated both their due process rights and a DNR regulation[28] by failing to conduct

**22.** An issue apparently not raised below, and not before us in this appeal, is the standing of the overriding royalty interest holders in ADL 369116 to request a lease extension or to appeal from either the lease extension denial or termination. *See Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 155 (Tex.2004) (noting that an overriding royalty interest is a nonparticipating interest, which means that the royalty owner is wholly dependent on the lessee to keep the lease alive); 38 AM.JUR.2D *Gas & Oil* § 217 (2009) ("An overriding royalty interest is subject to the terms of the lease upon which it is founded, so generally, when the lease terminates, either by its own terms or in some other regular manner consistent with good faith, the royalty itself comes to an end."); BLACK'S LAW DICTIONARY 1356 (8th ed. 2004) ("An overriding-royalty interest ends when the underlying lease terminates."). Because DNR implicitly concedes standing, we express no view on how the issue would be decided in the absence of such a concession. *See Allen v. Alas-*

*ka Oil & Gas Conservation Comm'n*, 1 P.3d 699, 702 n. 7 (Alaska 2000).

**23.** *Button v. Haines Borough*, 208 P.3d 194, 200 (Alaska 2009); *accord Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992) (citing *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

**24.** *Handley*, 838 P.2d at 1233.

**25.** *Id.; accord Bartley v. State, Dep't of Admin., Teachers' Ret. Bd.*, 110 P.3d 1254, 1263 (Alaska 2005).

**26.** *Button*, 208 P.3d at 200.

**27.** *Id.*

**28.** DNR "will, in its discretion, hold a hearing when questions of fact must be resolved." 11

a hearing before issuing his May 26, 2005, final agency decision affirming DO & G's approval of the 2005 POD and denying their requested remedy of an extension of ADL 369116's lease term. Critical to the analysis of Donkel and Allen's argument is recognizing what DO & G first decided and what then was the subject on appeal to the Commissioner.

Unocal's proposed 2005 POD described continued winding-down of the NMGS Unit because the unit had reached its economic limit and was depleted, Unocal had been unable to market the Baker Platform and related facilities, the Baker Platform was in lighthouse mode, and Unocal did not intend to pursue further exploratory efforts in the NMGS Unit. Unocal had assigned the working interest in ADL 369116 to Donkel, Bolt, and Kasper in late 2003 and noted in both the 2004 POD and the proposed 2005 POD that the obligation to drill an exploratory well on ADL 369116 rested with the new working interest holders. Unocal had not requested an extension of ADL 369116's lease term in the 2003 POD or the 2004 POD, and did not request an extension of ADL 369116's lease term in the proposed 2005 POD.

In short, DO & G was not asked to consider and did not consider an extension of ADL 369116's lease term in connection with its consideration of the proposed 2005 POD for the NMGS Unit. DO & G's approval of the 2005 POD expressly stated that if the working interest holders of ADL 369116 fulfilled their drilling commitment by December 31, 2005, the NMGS Unit would not automatically terminate on that date as set forth in the terms of the 2002 settlement agreement.

Donkel and Allen did not participate in the DO & G proceedings, but they nonetheless filed identical appeals to the Commissioner from "the approval of the 2005 Plan of Development" for the NMGS Unit "as set forth in the March 31, 2005, decision by [DO & G]." [29]

Donkel and Allen appealed DO & G's decision for two reasons. First, they asserted that the plan to abandon the Baker Platform and its related facilities would "have a material, negative impact" on their rights and interests, including the opportunity to develop ADL 369116. Second, they asserted that a cloud on title due to DO & G's issuing and subsequently revoking Wagner's lease interest in a portion of ADL 369116 "unreasonably and unfairly disrupted and interfered with" the working interest holders' ability to comply with the drilling commitments. Both claimed they lacked the ability to review the information the Commissioner relied upon in reaching his decision, and thus were unable to verify his decision or assert disputed material facts. Donkel and Allen requested "an oral hearing" and, as a remedy on appeal, an extension of ADL 369116's lease term.

Responding directly to Donkel and Allen about the failure to allege a specific material fact dispute and the possible need for a hearing, the Commissioner promptly advised that "all of the information that [DO & G] consulted and relied upon in approving the 2005 POD is available in the public record [and may be reviewed at DO & G's] Anchorage office during regular office hours. Therefore, request for hearing is denied." The Commissioner further stated that he would make a decision "[f]ollowing review of the case file, applicable law, and any other pertinent documents. . . ."

Donkel and Allen did not subsequently object to the Commissioner's response or give notice of specific disputed material facts that warranted a hearing, nor did they seek to submit additional material to support their cursory appeals. At no time before the hearing did Donkel or Allen make any kind of showing about disputed issues of material fact or specific evidence they might present. Even after the Commissioner issued his decision, Donkel and Allen failed to take advantage of their opportunity to submit additional

AAC 02.050(a). But 11 AAC 02.050(b) qualifies subsection (a) by providing that "the hearing procedure will be determined . . . on a case-by-case basis."

**29.** Appeals to the Commissioner must be in writing and, among other things, specify: (1) the

decision appealed; (2) bases on which the decision is challenged; (3) material facts disputed by the appellants; (4) the requested remedy; and (5) whether an oral hearing is requested. 11 AAC 02.030(a)(1), (7)-(10), (13).

information with a request for reconsideration.[30]

Under these circumstances we cannot conclude the Commissioner violated Donkel's and Allen's due process rights or the DNR regulation providing for a hearing to resolve disputed issues of fact.

■ As to due process, the superior court correctly stated that DO & G's approval of the 2005 POD did not involve the deprivation of any property interest held by Donkel and Allen. Although due process requires notice and an opportunity to be heard prior to governmental deprivation or infringement of valuable property rights,[31] this constitutional protection does not automatically attach to every governmental action without consideration of what rights are at stake and how they might be affected.[32] DO & G's approval of the 2005 POD neither deprived nor infringed on Allen's overriding royalty interest in ADL 369116. Nor did DO & G's approval of the 2005 POD deprive or infringe on Donkel's working interest or his overriding royalty interest in ADL 369116. Donkel's and Allen's property interests in ADL 369116 were unchanged after DO & G's approval of the 2005 POD. The working interest holders had the same right to develop ADL 369116 after DO & G's approval of Unocal's 2005 POD as they had before that approval—the 2005 POD merely reaffirmed that Unocal would not be responsible for developing ADL 369116 in the coming year. Simply put, and as the superior court concluded, neither DO & G's approval of the 2005 POD nor the Commissioner's consideration of whether that approval should be affirmed or reversed implicated due process protections for Donkel and Allen.

Donkel and Allen appear to believe that by merely asserting the right to a lease extension as a remedy for DO & G's approval of the 2005 POD, which was unrelated to whether the drilling requirements for ADL 369116 should be enforced or modified or whether the lease term for ADL 369116 should be extended, they have a valuable property right at stake. We disagree. But even if due process protections could be invoked, there can be no dispute that Donkel and Allen had actual notice of DO & G's approval of the 2005 POD and were heard by the Commissioner before he issued the final agency decision. Full-scale evidentiary hearings are not required for every occasion to which due process applies,[33] and Donkel and Allen do not persuade us that the record hearing afforded to them by the Commissioner violated any applicable due process.

In *White v. State, Department of Natural Resources*[34] we noted that neither due process nor 11 AAC 02.050(a) requires a hearing if there is no dispute. We reiterated that although a hearing

> is normally one of the basic components of due process, it is subject, at least in the area of administrative law, to the exception that one need not hold a hearing if there is nothing to hold a hearing about; or, more precisely, "there is no requirement, constitutional or otherwise, that there be a hearing in the absence of substantial and material issues crucial to (the) determination." [35]

In *White* an assignee of an oil and gas lease appealed to the Commissioner from DO & G's refusal to approve his assignment because the lease had already terminated.[36] The assignee asserted on appeal that one of

---

**30.** *See* 11 AAC 02.030(e) (allowing submission of additional written materials, including evidence and legal argument, upon a request for reconsideration).

**31.** *Heitz v. State, Dep't of Health & Soc. Serv.*, 215 P.3d 302, 305 (Alaska 2009) (quoting *Bostic v. State, Dep't of Revenue, Child Support Enforcement Div.*, 968 P.2d 564, 568 (Alaska 1998)).

**32.** *See id.* ("When a party raises a due process claim, we first must determine whether there is a deprivation of an individual interest of sufficient importance to warrant constitutional protection." (quoting *Bostic*, 968 P.2d at 568)).

**33.** *Id.* at 308 n. 30 (quoting *Haggblom v. City of Dillingham*, 191 P.3d 991, 995 (Alaska 2008)).

**34.** 984 P.2d 1122 (Alaska 1999).

**35.** *Id.* at 1126 (quoting *Estate of Miner v. Commercial Fisheries Entry Comm'n*, 635 P.2d 827, 834 (Alaska 1981) (citations omitted) (quoting *Nat'l Labor Relations Bd. v. Bata Shoe Co.*, 377 F.2d 821, 826 (4th Cir.1967))).

**36.** *Id.* at 1124.

the lease conditions for an automatic extension had been met, but the Commissioner denied the appeal without a hearing.[37] When the appeal reached us DNR argued that the assignee was raising a theory that had not been raised to the Commissioner.[38] We noted that the assignee had stated in filings to the Commissioner that he would present specific testimony about disputed factual matters that ultimately underpinned his later theory.[39] We held there was a factual dispute about whether the condition had been met and that the Commissioner had abused his discretion by not granting a hearing under 11 AAC 02.050(a).[40]

Donkel and Allen presented the Commissioner with theories; they did not show they could present evidence to support them or to contradict the evidence considered by DO & G in approving the 2005 POD. Donkel and Allen argue that the Commissioner should have, on his own, considered Gottstein's June 2004 letter in combination with Donkel's and Allen's stated bases for appeal. They contend the Commissioner then would have recognized an issue of disputed material fact about harm to the working interest holders from the "Wagner cloud on title" between 2001 and September 2004. The two passages are as follows, first from Gottstein's June 2004 letter on behalf of Donkel and Allen seeking to clarify whether DO & G's approval of the 2004 POD constituted a decision to terminate ADL 369116:

> The [Wagner lease] problem is real because it is my understanding a company decided against a drilling program in Cook Inlet to include ADL 369116 because of the cloud on title created by the Division. My understanding is that not only was ADL 369116 affected, but that drilling of another lease is not occurring because of the continuing cloud on ADL 369116's title created by the Division.

and then from Donkel's and Allen's appeals:

> The ability of the working interest owners in ADL 369116 to fulfill the drilling commitment of the Initial Test Well has been

unreasonably and unfairly disrupted and interfered with due to the cloud on title arising from the delay and bad faith in initial selling and then actions to terminate any interest of Rick Wagner in ADL 389508, covering a part of ADL 369116.

First, we note it was incumbent on Donkel and Allen to present the Commissioner sufficient information to conclude there was a dispute about an issue of material fact—it was not the Commissioner's duty to guess what Donkel and Allen were referring to and to scour DO & G's files to determine whether a disputed issue of material fact existed to support their hearing request. Second, these two vague and conclusory statements are insufficient to raise a material factual issue—the decision before the Commissioner was whether to affirm DO & G's approval of the 2005 POD, not some other action by DO & G implicating ADL 369116's lease term. Finally, after the Commissioner issued his decision neither Donkel nor Allen made an offer of proof to either the Commissioner or the superior court as to any specific evidence that could support their otherwise vague and conclusory allegations of harm. Even at oral argument before us, neither Gottstein nor counsel for Donkel and Allen could point to anything in the record other than the two statements noted above to support their argument that the "Wagner cloud on title" actually affected any working interest holder's ability to drill the required exploratory well on ADL 369116 by December 31, 2005.

We therefore affirm the superior court's decision upholding the Commissioner's denial of an oral hearing on the appeal from DO & G's approval of the 2005 POD.

## B. The Commissioner Had a Reasonable Basis To Affirm DO & G's Approval of Unocal's 2005 POD for the NMGS Unit.

### 1. The Commissioner's decision

The Commissioner made specific findings on the two articulated bases for Donkel's and Allen's appeals from DO & G's approval of

---

**37.** *Id.* at 1124–25.

**38.** *Id.* at 1127.

**39.** *Id.*

**40.** *Id.* at 1126, 1128.

the NMGS Unit 2005 POD. He first found that the 2005 POD would not have a negative influence on ADL 369116's working interest holders' ability to drill the required exploratory well by December 31, 2005:

*Abandonment of the Baker Platform*

The working interest owners in ADL 369116 have a commitment to drill an Initial Test Well by the end of 2005. Removal of the Baker Platform will not impact the [Appellants'] ability to explore for hydrocarbons within their lease. The boundary of ADL 369116 is over three miles from the Baker Platform; too far away to support an exploration well with a bottom-hole location on ADL 369116. In 1997, Unocal drilled a highly deviated well, Baker # 32, to a true-vertical depth of 4,761 feet and produced gas from the STGR. However, the bottom-hole location of Baker # 32 is about 2.12 miles from the southern boundary of ADL 369116.

Even if a well could be drilled from Baker Platform to ADL 369116, DNR does not have the authority to compel Unocal to make the Baker platform available to the Appellants. This appeal is not the appropriate forum for Appellants to obtain approval to use Unocal facilities. Appellants need to contact Unocal regarding the use of Unocal's facilities.

Under Unocal's plan, the Baker Platform will remain in place for several more years. The AOGCC approved Unocal's proposed schedule to plug and abandon the wells on the Baker Platform over the next three years. However, the AOGCC and Unocal have not yet agreed on the procedures necessary to plug and abandon the wells. The Baker Platform will remain in place until all of the wells are plugged and abandoned to the satisfaction of the AOGCC and perhaps even longer. All of the original Cook Inlet Platforms remain in place, although several are shut-in. The lessees, the Division, and various state and federal agencies are developing guidelines and drafting regulations to implement platform abandonment. It may take several years to complete this process before the platform owners can remove the platforms.

Second, the Commissioner also found that the "Wagner appeal in no way interfered with" the right to seek approval for drilling operations on ADL 369116 after Unocal reassigned the entire working interest in the lease to Donkel, Bolt, and Kasper in late 2003.

The Commissioner concluded that: (1) DO & G had "appropriately considered the criteria in 11 AAC 83.303 in its evaluation of Unocal's proposed 2005 POD"; (2) "[n]either issuance of [the lease] to Wagner nor termination of that lease interfered with the Appellants' rights [and the] working interest owners of ADL 369116 were free and are still free and able to exercise their right to fulfill the Initial Test Well drilling commitment set out in the [2002 settlement] or otherwise develop ADL 369116"; and (3) "approval of the 2005 POD was necessary and advisable to protect the public interest."

## 2. The Baker Platform issue

■ Donkel and Allen argue that they were denied the opportunity to present evidence of the 2005 POD's potential adverse consequences on plans to develop ADL 369116, that the Commissioner therefore did not have the necessary information before him to make an informed decision, and, specifically, that the Commissioner did not fully appreciate the effect abandoning the Baker Platform would have on ADL 369116's working interest holders.

Donkel and Allen's arguments to us differ from the arguments they made to the superior court. There they argued that decommissioning the Baker Platform as set forth in the 2005 POD legally resulted in terminating the NMGS Unit. Thus Donkel and Allen stated they were "objecting to the ... approval of the cessation of unit production" and asserted the Commissioner had not diligently inquired into Unocal's claim that the NMGS Unit was no longer capable of producing oil and gas in paying quantities.

Nothing in the record supports Donkel and Allen's assertion that they were prevented from submitting supporting evidence to the Commissioner. They simply chose to rely on cursory statements of appeal that facially failed to give rise to the need for an eviden-

tiary hearing. Donkel and Allen's assertion to the superior court that approval of the 2005 POD somehow terminated the NMGS Unit was similarly incorrect—DO & G expressly stated in its approval of the 2005 POD that the NMGS Unit remained in place pending fulfillment of the December 31, 2005, drilling obligation for ADL 369116.

During the pendency of Donkel's and Allen's appeals to the Commissioner, the working interest in ADL 369116 was being assigned to Renaissance Resources. The assignment was effective August 1, 2005, but even before that time Renaissance Resources was in contact with DO & G about an extension of the drilling obligation for ADL 369116. Renaissance Resources's drilling proposals for ADL 369116 had nothing to do with the Baker Platform. And if the Baker Platform were somehow critical to the development of ADL 369116, Unocal was, as Donkel and Allen had to have known,[41] actively seeking an operator or purchaser of the Baker Platform and its related facilities—Renaissance Resources, or Donkel and Allen, could have negotiated some kind of arrangement with Unocal.[42]

Finally, the superior court's explanation for affirming the Commissioner's findings and conclusions on the Baker Platform issue sufficiently covers the arguments made in that court and in this court:

> The [facts] clearly demonstrate[ ] that as of August 2003, [DO & G] had approved the Revised 2003 POD and Unocal's plans to decommission the Baker Platform. If Appellants wished to challenge that approval, they should have done so in 2003. Further, [DO & G] approved Unocal's 2004 POD in May 2004. Again, if Appellants wished to challenge that decision, they should have done so in 2004.... Unocal suspended production from the NMGS

Unit under the 2002 Plan of Development and decommissioned the Baker Platform, located on ADL 17595. All that Unocal proposed in 2005, and all that the [AOGCC] approved, and all that [DO & G] approved, was entirely consistent with the terms (especially paragraph 7) of the Court Order Approving Settlement and [DO & G's] previous approval of Unocal's 2003 and 2004 POD's.

The gist of Appellants' substantive argument on appeal to the Commissioner was their assertion that the plans to abandon the Baker Platform would have a material, negative impact on their rights, interest, and opportunity to explore, drill, and develop ADL 369116. The Commissioner rejected this argument[.]

. . . .

The facts recited by the Commissioner are undisputed. The factual conclusions drawn by the Commissioner from these facts are reasonable and within the expertise of his agency. As such, they are due considerable deference. The legal conclusions the Commissioner reached are also within the range of subject matter expertise committed to the agency. They are reasonable, and are affirmed.

We agree with the superior court and affirm its decision to uphold the Commissioner's findings and conclusions on this issue.

### 3. The "Wagner cloud on title" issue

█ Donkel and Allen focus most of their attention on this issue, arguing that the Commissioner erred as a matter of law or abused his discretion by not granting their request for an extension of ADL 369116's lease term. They assert that: (1) the putative Wagner lease was a cloud on title to ADL 369116 from 2001 through September 2004;[43] (2)

---

**41.** See note 13, above.

**42.** The operating agreement for the NMGS Unit provided that if the working interest holders in the unit approved the abandonment of unit wells, objecting working interest holders could buy out the other working interest holders. Donkel was a working interest holder between December 2003 and August 2005, and he and his assignee, Renaissance Resources, presumably could have

taken advantage of the buy-out provision of the operating agreement.

**43.** Assuming the Wagner lease created a cloud on title to ADL 369116, Donkel and Allen exaggerate the period of time it could have affected drilling. ADL 369116 was reinstated in December 2002. Unocal held the working interest in ADL 369116 from December 2002 through December 2003, when the assignments to Donkel, Bolt, and Kasper were approved. No one asserts

DO & G's failure to remove that cloud on title in a timely fashion was a breach of express or implied contract terms in either or both the ADL 369116 lease agreement and the 2002 settlement agreement; and (3) the cloud on title adversely affected their ability to drill the required well on ADL 369116 by December 31, 2005, specifically that the "delay jeopardized Appellants' ability to mobilize the necessary investment and drilling equipment by the December 31, 2005 deadline."

The fundamental flaw in this argument is that there is no evidence in the record to support the contention that the Wagner lease adversely affected development and drilling plans for ADL 369116. The superior court stated that "Appellants make no real showing that they were in any way harmed by [the] erroneous lease to Wagner." When asked at oral argument before us to specify evidence showing harm, neither Gottstein nor Donkel and Allen's attorney could point to any evidence other than Gottstein's June 2004 letter about his "understandings" of problems and Donkel's and Allen's conclusory allegations of harm in their appeal papers to the Commissioner.

We note that Unocal's 2004 POD (submitted in February 2004 for June 2004 through May 2005) stated that Donkel, Bolt, and Kasper had not given Unocal any indication of plans to drill the required exploratory well on ADL 369116. Such notice was required under the NMGS Unit agreements. Without an actual showing of harm, specifically some evidence that an investor refused to participate or an entity refused to commit to drilling because of the Wagner lease, we cannot say that the Commissioner erred by finding that the Wagner lease had no adverse effect on the right and ability to drill the exploratory well on ADL 369116.

Moreover DO & G was not asked to consider, and did not consider, whether ADL 369116's lease term should be extended because of the Wagner lease, or for any other reason. The proposed 2005 POD had no influence on the drilling commitment for ADL 369116—Unocal already had declined to fulfill that commitment and had assigned the lease's working interest to Donkel, Bolt, and Kasper. Thus another fundamental flaw in Donkel and Allen's argument is that the Commissioner's consideration of the Wagner lease issue was limited to how it might influence his decision to affirm or reject DO & G's approval of Unocal's 2005 POD. After concluding that the Wagner lease issue had no bearing on the 2005 POD approval, no remedial action by the Commissioner—including the requested extension of ADL 369116's lease term—was warranted.

We agree with the superior court and affirm its decision upholding the Commissioner's findings and conclusions on this issue.

### 4. The "best interest" issue

Donkel and Allen argue to us that the Commissioner failed to identify which criteria listed in 11 AAC 83.303(b),[44] if any, he considered before rendering his final agency decision. Donkel and Allen did not argue to the Commissioner that DO & G had failed to consider or identify the criteria it considered in approving the 2005 POD; they instead gave two specific reasons for their appeal of the 2005 POD, which the Commissioner addressed.

But Donkel and Allen now contend that DO & G's March 31, 2005, approval letter and the Commissioner's May 26, 2005, final decision do not "permit intelligent appellate review." They urge us to remand to the agency for better findings supporting the conclusion that approval of the 2005 POD was in the best interests of the State. They also contend that because oil and gas reserves remain under the NMGS Unit, removal of the Baker Platform and the cessation of drilling in the NMGS Unit are not in the best interests of the State. This argument is unpersuasive.

---

that Unocal was dissuaded from drilling on ADL 369116 because of the Wagner lease. Any cloud on title the Wagner lease created was extinguished in September 2004 when Wagner's time expired for an appeal from the Commissioner's

final decision approving the revocation of his lease. Thus the relevant time period is December 2003 through September 2004.

**44.** *See* note 17, above.

As early as August 2003, shortly before Unocal gave its October 2003 notice that it would not commit to drilling the required exploratory well on ADL 369116 and then assigned the working interest in ADL 369116 to Donkel, Bolt, and Kasper, the plan for the NMGS Unit was to wind it down. At that time DO & G approved Unocal's plan "to remove the drilling rig from the [Baker Platform,] shut in all producing wells, clean the surface equipment ..., leave all producing and water injection wells shut-in as is, and light house the facility by October 2003." Donkel and Allen did not appeal from the approval of the 2003 POD. In May 2004 DO & G approved Unocal's plan to discontinue its exploratory operations in the NMGS Unit and to maintain the Baker Platform in lighthouse mode. Donkel and Allen did not appeal from the approval of the 2004 POD. In October 2004 Unocal gave the AOGCC notice of its plan to ultimately abandon wells from the Baker Platform. There is no evidence in the record that Donkel and Allen raised any concerns or objections with the AOGCC.

It is from this posture that DO & G's review of Unocal's proposed 2005 POD must be considered, with the further understanding that the proposed 2005 POD: (1) covered only the time period from June 2005 through May 2006; (2) contemplated only the continuing status of lighthouse mode, not imminent removal of the Baker Platform; and (3) expressly noted that if the exploratory well on ADL 369116 was drilled by December 31, 2005, the NMGS Unit would continue in existence. DO & G and the Commissioner considered all of the specific factors of 11 AAC 83.303(b) when the 2005 POD was approved: (1) the known reserves underlying the unit (11 AAC 83.303(b)(2)); (2) prior exploration in the unit (11 AAC 83.303(b)(3)); (3) Unocal's future plans for the unit, acknowledged by the AOGCC (11 AAC 83.303(b)(4)); and (4) the environmental and economic costs and benefits of maintaining the status quo pending results of the required drilling on ADL 369116 (11 AAC 83.303(b)(1), (5)).

We can discern the agency's consideration of these factors from the record and do not need to remand for additional or more specific findings. DO & G and the Commissioner considered the criteria of 11 AAC 83.303(b) and the record reflects a reasonable basis for the Commissioner's conclusion that approval of the 2005 POD was in the State's best interest. We therefore affirm the superior court's decision upholding the Commissioner's decision on this issue.

#### 5. The 2006 final agency decision

Donkel and Allen argue that the Commissioner also erred in his April 2006 final agency decision terminating ADL 369116 and the NMGS Unit for failure to have the required exploratory well drilled on the lease by December 31, 2005.

This decision was the subject of Donkel and Allen's second appeal to the superior court. Donkel and Allen did not file a brief for their second appeal, advising the superior court that they would rely on the arguments raised in the brief they filed for their appeal from the Commissioner's May 2005 final decision affirming DO & G's approval of Unocal's 2005 POD for the NMGS Unit. The superior court allowed Donkel and Allen to do so, but without the ability to raise new arguments. The superior court denied Donkel and Allen's appeal on all of the issues they raised and rejected all other issues as waived for failure to raise them at the agency level or to brief them at the superior court level.

Donkel and Allen now suggest it is not clear whether the superior court intended its decision to dispose of their appeal from the Commissioner's April 2006 final agency decision terminating ADL 369116 and the NMGS Unit. They argue that for all the reasons set forth in their appeal from the Commissioner's May 2005 final agency decision on Unocal's 2005 POD for the NMGS Unit, the Commissioner's May 2006 final agency decision terminating ADL 369116 should be reversed.

Because we affirm the Commissioner's May 2005 final agency decision as to all issues raised by Donkel and Allen, and those are the only issues raised in connection with their appeal from the Commissioner's April 2006 final agency decision on the termination of the ADL 369116 and the NMGS Unit, we therefore affirm the superior court's decision upholding the Commissioner's April 2006 final agency decision as well.

### C. The Superior Court Did Not Err in Denying a Trial De Novo.

Gottstein requested a trial de novo in the superior court under Alaska Rule of Appellate Procedure 609(b)(1),[45] asserting that (1) "DNR is disqualified as the decision maker because it is acting in its proprietary capacity as the owner/lessor of the property involved" and (2) there was evidence of DNR's "bad faith in continuing to cloud title on ADL 369116 through the failure to finish terminating the Wagner lease."

■ Appellate Rule 609(b)(1) leaves the decision to grant a trial de novo to the discretion of the superior court.[46] We review a decision to deny a trial de novo for abuse of discretion, which is found only when "we are 'left with a definite and firm conviction after reviewing the whole record that the [superior] court erred in its ruling.' "[47] We have noted that a trial de novo is

> a departure from the norm. A court normally reviews an agency's decision on the record. While Appellate Rule 609 affords the superior court discretion to conduct a trial de novo, it is rarely warranted. This court has upheld or directed application of de novo review where certain issues are not within the expertise of the reviewing body; where the agency record is inadequate; where the agency's procedures are inadequate or do not otherwise afford due process; or where the agency was biased or excluded important evidence in its decision-making process.[48]

■ In *ConocoPhillips Alaska, Inc. v. State, DNR* we implicitly rejected the argument that DNR has a proprietary interest in leasing land for oil and gas development that

would disqualify it as an impartial decision-maker.[49] We reiterate here that DNR's regulatory oversight of State leases is insufficient to show actual or probable bias in connection with DNR decisions involving private interests in those leases. We also reiterate that agency personnel are presumed to be impartial until a party shows actual bias or prejudgment.[50] Commissioner Irwin was not the Commissioner when: (1) ADL 369116 was terminated as of December 31, 1999; (2) the Wagner lease was issued and revoked in 2001; or (3) the termination of ADL 369116 was reversed by the 2002 settlement of Donkel's appeal from Commissioner Shiveley's decision affirming DO & G's denial of Unocal's application for a participating area covering ADL 396116. Even accepting at face value Gottstein's unsubstantiated allegations of bad faith on the part of some DNR personnel with respect to the Wagner lease, Gottstein has made no showing that Commissioner Irwin, who decided the appeals from DO & G, prejudged any facts or was motivated by actual bias against Gottstein, Donkel, or Allen in connection with any of the three final agency decisions on appeal.

There is no basis to conclude that the superior court abused its discretion in denying Gottstein's motion for a trial de novo. We therefore affirm the superior court's decision on this issue.

### D. The Dismissal of Gottstein's Appeals Was at Most Harmless Error; We Affirm the Attorney's Fee Award.

After his motion for trial de novo was denied, Gottstein gave notice that he did not intend to file any briefs on the merits of his appeal issues but instead would, if and when appropriate, appeal the trial de novo issue to

---

45. Alaska R.App. P. 609(b)(1): ("In an appeal from an administrative agency, the superior court may in its discretion grant a trial de novo in whole or in part.").

46. *Id.*

47. *S. Anchorage Concerned Coal., Inc. v. Municipality of Anchorage Bd. of Adjustment,* 172 P.3d 774, 778–79 (Alaska 2007) (quoting *Christensen v. NCH Corp.,* 956 P.2d 468, 473 (Alaska 1998)).

48. *Id.* at 778 (internal citations omitted).

49. 109 P.3d at 924 (noting that the proprietary issue was raised by the appellant, but affirming the commissioner's decision without further comment); *see also Conoco, Inc. v. State, Dep't of Natural Res.,* No. S–4803, 1993 WL 13563632, at *2 (Alaska 1993) ("[W]e have rejected the argument that DNR's involvement in oil and gas leasing was a proprietary function." (citing *State, Dep't of Natural Res. v. Arctic Slope Reg'l Corp.,* 834 P.2d 134, 143 (Alaska 1991))).

50. *See AT & T Alascom v. Orchitt,* 161 P.3d 1232, 1246 (Alaska 2007).

us. When faced with the later motion to dismiss his appeals for lack of prosecution, Gottstein then stated an intent to rely on Donkel and Allen's briefing to support his appeal points. The superior court nonetheless dismissed Gottstein's appeals for failure to prosecute.

Gottstein argues that the superior court erred in dismissing his appeals when he was prosecuting them by filing the trial de novo motion and relying on Donkel and Allen's briefing. We do not need to decide this issue because even if Gottstein's appeals should not have been dismissed, they were voluntarily limited to the issues raised and briefed by Donkel and Allen. The superior court denied Donkel and Allen's appeals and we agree with the superior court's decision. Therefore, any error in dismissing Gottstein's appeals was harmless.

Gottstein also argues that it was an abuse of discretion for the superior court to enhance the attorney's fees award in favor of DNR and against him because of his alleged failure to prosecute his appeals. After the superior court disposed of Donkel and Allen's appeals, it awarded DNR $1,000 in attorney's fees against Gottstein, stating that the amount was "chosen because Mr. Gottstein, by appealing, caused the State to incur substantial attorneys' fees ($24,559.55), but Mr. Gottstein failed to prosecute the appeal." Despite the superior court's language, the nominal amount of the attorney's fees award does not reflect an enhancement for the alleged failure to prosecute. In context, the superior court was explaining that because of the substantial proceedings regarding the requested trial de novo, DNR was a prevailing party entitled to a discretionary fee award under Appellate Rule 508(e) notwithstanding the general rule of Appellate Rule 508(a) that attorney's fees not be awarded when an appeal is dismissed. We affirm the superior court's award of $1,000 in attorney's fees in favor of DNR and against Gottstein.

## V. CONCLUSION

We AFFIRM the superior court's decision.